814 A.2d 1173 (2003)
357 N.J. Super. 288
Deborah PRESIDENT and Perry President, Plaintiffs-Appellants,
v.
Dr. Reginald JENKINS, Defendant-Appellant, and
St. Barnabas Medical Center, Princeton Insurance Company, C & R Insurance Agency and Zurich Insurance Company, Defendants-Respondents, and
Dr. Lamberto Flores and Dr. Francine Hughes, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 2003.
Decided February 6, 2003.
*1177 Larry L. Leifer, Maplewood, argued the cause for appellants, Deborah and Perry President.
Hugh P. Francis, argued the cause for defendant-appellant, Dr. Reginald Jenkins (Francis & O'Farrell, attorneys, Morristown; Mr. Francis, of counsel; Peter A. Olsen, on the brief).
James P. Rhatican, argued the cause for defendant-respondent, St. Barnabas Medical Center (Connell Foley, attorneys, Roseland; Mr. Rhatican, of counsel; Mr. Rhatican and Jennifer Leigh Barnes, Jersey City, on the brief).
William E. McGrath, Jr., Princeton, argued the cause for defendant-respondent, Princeton Insurance Company (Smith, Stratton, Wise, Heher & Brennan, attorneys; Mr. McGrath, of counsel and on the brief).
Eric L. Harrison, Edison, argued the cause for defendant-respondent, C & R Insurance Agency (Methfessel & Werbel, attorneys; Mr. Harrison, of counsel and on the brief).
Kevin T. Coughlin, argued the cause for defendant-respondent, Zurich American Insurance Company (McElroy, Deutsch & Mulvaney, attorneys, Morristown; Mr. Coughlin, of counsel; David D. Hess, on the brief).
Williams, Cuker & Berezofsky, Cherry Hill, for amicus curiae The Association of Trial Lawyers of America-New Jersey (Kevin Haverty, on the brief).
Before Judges NEWMAN, PARRILLO and LANDAU. *1174 *1175
*1176 The opinion of the court was delivered by PARRILLO, J.A.D.
In these consolidated appeals from an underlying medical malpractice action, we consider primarily whether the physician alleged to be negligent is covered under a "claims made" professional liability insurance policy issued by a successor insurer and, if not, whether the hospital where he enjoys admitting privileges has a duty to third parties to ensure that he is insured. We also consider whether the predecessor insurer has a duty to advise the hospital of the cancellation of the physician's insurance, the event that caused the gap in insurance coverage, and whether the insurance broker breached a professional duty of care in failing to bridge the gap. As did the trial judge, we answer these questions in the negative. Accordingly, we affirm the grant of summary judgment in favor of both insurers and the broker, as well as the denial of plaintiff's motion to amend her complaint to assert a claim against the hospital on the basis of such a perceived duty.
The material facts are not in dispute. Plaintiff Deborah President (plaintiff) experienced undiagnosed eclampsia during labor and delivery of her child, and as a result, sustained brain damage, partial paralysis and seizure disorder. She and her husband[1] sued her attending obstetrician, Dr. Reginald Jenkins, the hospital where he had admitting privileges, St. *1178 Barnabas Medical Center (St. Barnabas), and two of its resident physicians, Drs. Lamberto Flores and Francine Hughes, alleging professional negligence in plaintiff's care and treatment on January 3 and 4, 1998. Eventually, the malpractice claims were dismissed against all defendants except Jenkins.
At the time of the incident giving rise to the medical malpractice claim, Jenkins was in the process of securing new insurance coverage, changing from "occurrence" to "claims made" protection.[2] He had been insured by Princeton Insurance Company (Princeton) since 1987 under an "occurrence plus" malpractice insurance policy that was renewed for successive one-year periods through February 1998. However, Princeton canceled the most recent renewal policy, effective October 26, 1997, because Jenkins repeatedly failed to make his premium payment. In fact, throughout the fall of 1997, Jenkins received notices from Princeton advising that unless he paid his premium, the insurance policy would be canceled. Eventually, in a letter dated January 9, 1998, Princeton canceled Jenkins' insurance policy retroactive to October 26, 1997.
Despite these notices, Jenkins never advised St. Barnabas, whose by-laws require all admitting physicians to maintain professional liability coverage, of the cancellation of his insurance policy. Back in January 1996, he had advised the hospital's Risk Management department that he had medical malpractice insurance coverage with Princeton, and later in November 1996 provided St. Barnabas with the renewal certificate indicating coverage running from February 1, 1997 to February 1, 1998. However, Jenkins failed to notify the hospital of this latest development. Apparently, he was of the opinion that if he eventually paid the late premium, his insurance would be reinstated. Yet, despite this belief, Jenkins never paid the delinquent premium.
Instead, he negotiated with an insurance broker, C & R Insurance Agency (C & R), to obtain medical malpractice coverage under a "claims made" policy underwritten by the Zurich Insurance Company (Zurich). Jenkins advised C & R, both orally and in writing, that his policy with Princeton would expire on February 1, 1998 and, therefore, he needed coverage with Zurich commencing February 1, 1998. Accordingly, his premium was calculated based on a policy period of February 1, 1998 through January 1, 1999. Zurich, through C & R, issued Jenkins a binder, a certificate of insurance and an "additional insured physician's endorsement" naming him as an additional insured to the master policy of the Garden State Physicians' Alliance (GSPA) effective as of February 1, 1998.
Zurich does not issue medical malpractice insurance directly to individual physicians. Accordingly, C & R created GSPA for the express purpose of procuring liability insurance for its member health care professionals on a group basis. GSPA is registered and licensed with the New Jersey Department of Banking & Insurance as a recognized "Risk Purchasing Group" as defined in Section 3901 of *1179 the Liability Risk Retention Act, 15 U.S.C.A. §§ 3901 to 3906. GSPA had a "master policy" with Zurich under policy No. GPC-2727906-01. When a new physician would be added to the policy, an endorsement would be issued containing a "retroactive date", identical to the effective date of the endorsement, on which the additional insured physician would be entitled to insurance under the master policy as an additional insured. In other words, the effective date of coverage for the "additional insured" is the "retroactive" date applicable to each insured physician. On the other hand, a physician who joins the policy on a date after the effective date of the GSPA policy is charged a prorated premium to account for the fact that the physician is not receiving the benefit of coverage for "errors and omissions" that occur prior to the "retroactive" date. The effective date and the expiration date of the master policy are previously established, as the policy was purchased by the GSPA Purchasing Group prior to the addition of the "additional insured physicians."
The policy under which Jenkins was insured was denominated a "claims made" policy. The cover page of the insuring agreement bore the following notice:
THIS POLICY PROVIDES CLAIMS MADE COVERAGE. CLAIMS MUST FIRST BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND MUST BE REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD, OR WITHIN 60 DAYS AFTER EXPIRATION OF THE POLICY OR IF ENDORSED, DURING THE EXTENDED REPORTING PERIOD. PLEASE READ THE ENTIRE POLICY CAREFULLY.
As the binder, certificate of insurance, and each of the four policy endorsements issued to Jenkins plainly indicate, the effective date of coverage applicable to the individual "additional insured" was February 1, 1998, which was also designated the "retroactive" date in those same documents. And as made equally clear in the "coverage" section of the insuring agreement, the "retroactive" date of February 1, 1998 was the inception date on and after which acts of negligence committed by Jenkins, as the additional insured, would be covered provided they were reported during the policy period. Thus, the insuring agreement of the Zurich policy provides in pertinent part:
A. Coverage Provided
....

Coverage B  Physicians Professional Liability: We will pay on behalf of a physician, damages that the physician shall become legally obligated to pay because of a claim first made during the policy period arising out of a medical incident which occurred on or after the retroactive date and which is reported to us during the policy period.

[(emphasis added).]
Therefore, unlike the standard "claims made" policy, Zurich's policy provided Jenkins no retroactive coverage during its first year. In that year, the coverage provided by the policy applied only to errors and omissions that occurred during the policy year commencing February 1, 1998 and reported to the company within the policy year. Of course, during the renewal years, the policy afforded "retroactive" coverage for negligence that occurred subsequent to February 1, 1998.
Jenkins remained an "additional insured" under the GSPA group policy for the renewal year under policy No. GPC XXXXXXX-XX for the policy period January 1, 1999 through January 1, 2000, with the same "retroactive" date of February 1, 1998. It was during this renewal period *1180 that Jenkins made his claim for coverage for the January 3 and 4, 1998 incident involving plaintiff. Zurich denied coverage after Jenkins reported the claim because the acts of professional negligence alleged against him occurred prior to the February 1, 1998 "retroactive" date applicable to him.
Because of the gap in Jenkins' coverage created by the cancellation of the Princeton policy effective October 26, 1997 and the commencement of the Zurich policy on February 1, 1998, plaintiff, through amendments to her original complaint, added Princeton, Zurich and C & R as defendants, seeking direct recovery against them as a third-party beneficiary of the insurance coverage alleged to be available through those insurers to Jenkins. As to Princeton, plaintiff alleged negligence because, among other things, Princeton failed to notify St. Barnabas of the cancellation of Jenkins' policy. Plaintiff also moved for leave to amend her complaint to add an additional count against St. Barnabas for negligently permitting Jenkins admitting privileges without liability insurance coverage, but this effort was rejected by the trial judge who recognized no such cause of action.
In her fourth amended complaint, plaintiff also sought a declaratory judgment, pursuant to N.J.S.A. 2A:16-53, that the professional liability insurance policy issued by Zurich through C & R covered plaintiff's medical malpractice claim against him. Similarly, Jenkins was granted leave to amend his answer to plaintiff's fourth amended complaint to add cross-claims against Zurich and C & R, seeking a declaration of rights and coverage that he is entitled to defense and indemnity for plaintiff's claims against him.
Motions and cross-motions for summary judgment were filed by all parties save plaintiff. Judge Lawrence Weiss granted Princeton's motion for summary judgment and dismissed all claims against the insurer. Judge Weiss denied Jenkins' cross-motion for summary judgment and granted those of Zurich and C & R dismissing all claims against them by both plaintiff and Jenkins. On October 30, 2001, Jenkins, the only remaining defendant, and plaintiff entered into a settlement agreement memorialized in a consent order, resolving all issues between the two parties, thus rendering the prior orders of the trial court final.
Appeals were filed by plaintiff and Jenkins and consolidated. Plaintiff challenges both the dismissal of her complaint as to Princeton and the denial of her motion to amend the pleading to claim negligence by St. Barnabas in its failure to ensure that its admitting physicians have professional liability insurance coverage. Jenkins challenges the dismissal of its cross-claims against Zurich and C & R. We now address each of these claims individually.

I
Jenkins' claims against Zurich are twofold. First, he argues that the coverage limitations in Zurich's "claims made" policy, restricting coverage to claims reported to Zurich during the policy year for incidents occurring after the effective date of coverage, should not be enforced as violative of public policy and inconsistent with his reasonable expectations. Alternatively, he argues that even if enforceable, the policy language is vague and ambiguous and therefore should be construed to afford coverage effective January 1, 1998, the date applicable to the group policy, rather than February 1, 1998, the date applicable to Jenkins as an individual "additional insured," so as to encompass the underlying incident of January 3 and 4, 1998. We disagree as to both claims.
*1181 In support of his first contention, Jenkins relies exclusively on Sparks v. St. Paul Ins. Co., 100 N.J. 325, 495 A.2d 406 (1985), wherein the Court held that provisions of a policy limiting coverage to claims brought for negligence committed during the policy term and providing only limited retroactive coverage were unenforceable as violating public policy absent factual circumstances that would render such limited retroactive coverage both reasonable and expected. In Sparks, the insurer, St. Paul, had issued consecutive "claims made" policies to its insured, which only covered claims arising from the performance of professional services subsequent to the retroactive date and then only to claims first made during the policy year. Unlike the standard "claims made" policies that provide unlimited retroactive coverage for all errors and omissions occurring prior to the policy's inception, provided the claim is reported during the policy period, St. Paul's policy provided no retroactive coverage whatsoever in its first year, and only limited retroactive coverage during the renewal years, i.e., to the retroactive or effective date of the original policy. Although the legal malpractice incident in Sparks occurred during the policy period, it was not reported until after the policy had been canceled and, due to the cancellation, there was no "extended reporting" protection. Therefore, St. Paul denied coverage. The Court, however, refused to enforce the policy's coverage limitations as failing to conform to the objectively reasonable expectations of the insured that, in "claims made" policies, are to extend coverage for negligence occurring prior to the policy's inception, and as violative of public policy. 100 N.J. at 339, 495 A.2d 406. The Court reasoned:
[I]ndeed, St. Paul's policy combines the worst features of "occurrence" and "claims made" policies and the best of neither. It provides neither the prospective coverage typical of an "occurrence" policy, nor the "retroactive" coverage typical of a "claims made" policy. During the first year that the policy was in force, it provided no retroactive coverage for occurrences prior to the effective date of the policy. Thus, it afforded the insured only minimal protection against professional liability claims. Only claims asserted during the policy year, based on negligence that occurred during the policy year, and that were subsequently communicated to the company during the policy year were under the umbrella of coverage.

[Ibid.]
Sparks, however, did not set a precise standard by which the reasonableness of retroactive coverage is to be measured in every instance where coverage is claimed to be unreasonably narrow. On the contrary, it expressly recognized certain factual circumstances and contexts that would render such limited retroactive coverage both reasonable and expected. Id. at 340, 495 A.2d 406. Thus, for instance, "claims made" policies with no retroactive coverage "might be appropriate" where "offered at a reduced premium to the professional in his very first year of practice, or to the professional who changes from `occurrence' to `claims made' protection." Id. at 340 n. 4, 495 A.2d 406.
Such is the case here. Zurich's policy immediately followed a prior period of "occurrence" coverage, thus obviating the need for any greater retroactive coverage than was bargained for and obtained by Jenkins. Based on both the oral and written representations of the insured, Zurich insured Jenkins as an additional insured on its group policy as of February 1, 1998. The predecessor policies issued by Princeton to Jenkins since 1987 were "occurrence plus" policies, the most recent of which was scheduled to terminate on February *1182 1, 1998, coincident with the effective date of the inception of the Zurich policy. Such "occurrence" policies typically provide unlimited prospective coverage, that is for acts occurring during the period of the policy whatever the date of discovery and whenever reported. Thus, had the Princeton policy been in effect, as represented by Jenkins and reasonably understood by Zurich and C & R, there would have been seamless, uninterrupted coverage provided by both Princeton and Zurich covering, respectively, acts of negligence occurring prior to the inception of the Zurich policy, and claims made and reported after termination of the Princeton policy. Also, unlike Sparks, the Zurich policy offered Jenkins unlimited "extended reporting" coverage.
To be sure, Zurich's coverage diverges from customary "claims made" coverage in terms of retroactive protection. However, although the Zurich policy afforded no retroactive coverage for acts prior to the effective date of the policy, Jenkins was protected against professional liability claims for those incidents under his "occurrence plus" policy with Princeton. Thus, unlike the situation in Sparks, here there would have been no gap in coverage in the transition from "occurrence" to "claims made" protection but for the premature cancellation of the Princeton policy due to Jenkins' failure to pay premiums due.
It is solely this lapse on the part of the insured, due exclusively to his own actions, that has created the break in protection and, therefore, Jenkins should not now be heard to complain that Zurich's limited retroactive coverage was neither reasonable nor expected. Indeed, nothing in the record suggests other than that good faith bargaining took place between the parties, that the terms of the policy were specifically bargained for and understood by Jenkins, and that the insured specifically elected to purchase this policy with limited retroactive coverage. We therefore reject Jenkins' argument because the unambiguous provisions of the policy clearly restricted retroactive coverage, the premiums were presumably reduced to reflect this limited protection, and such protection was adequate given the facts known and available to Zurich and C & R at the time the policy was issued. Under these circumstances, we hold that the limited retroactive coverage afforded by Zurich was both reasonable and expected, and not violative of public policy. Thus, the coverage limitations of the policy are enforceable and preclude coverage of Jenkins' claim in this instance, arising as it does from alleged negligence occurring before the policy's effective date.
Jenkins argues, alternatively, that even if the policy's coverage restrictions are enforceable, his claim is nevertheless covered since it arises from an alleged act of negligence occurring after the effective date of the policy, which, because of an ambiguity, he construes to be January 1, 1998. The motion judge found no such ambiguity, and "[t]hat the document couldn't be clearer." Judge Weiss reasoned:
It is clear, unequivocal, effective date of policy for incident, 2/1/98, insurance company, Zurich Insurance Company.
Subsequent thereto, Exhibit D, shows that Zurich issued a binder to Dr. Jenkins. Binder period from 2/1/98 to 4/1/98; policy periods.
Thereafter, there's a certificate of insurance,... in which it says: "Professional liability insurance, effective date, 2/1/98."
We agree.
It is a well established principle that courts will not engage in creating ambiguity in construing insurance contracts *1183 where none exists, or in fashioning a better contract for either party than they themselves have made. Universal Underwriters v. CNA Ins. Co., 308 N.J.Super. 415, 420, 706 A.2d 217 (App.Div.1998); Royal Ins. Co. v. Rutgers Cas. Ins. Co., 271 N.J.Super. 409, 416, 638 A.2d 924 (App.Div.1994) (quoting Flynn v. Hartford Fire Ins. Co., 146 N.J.Super. 484, 488, 370 A.2d 61 (App.Div.), certif. denied, 75 N.J. 5, 379 A.2d 236 (1977), and citing Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 161 A.2d 717 (1960); Kook v. American Surety Co., 88 N.J.Super. 43, 210 A.2d 633 (1965)). In the absence of ambiguity, courts are constrained to adhere to the specific language of the policies, which will be given its ordinary meaning. Universal Underwriters, supra, 308 N.J.Super. at 419-420, 706 A.2d 217; Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990). As our Supreme Court noted:
[W]hen the terms of an insurance contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties. (citations omitted). The parties are entitled to make their own contracts. (citations omitted). Absent statutory prohibitions, an insurance company has the right to impose whatever conditions it desires prior to assuming its obligations and such provisions should be construed in accordance with the language used. (citation omitted).
[Kampf, supra, 33 N.J. at 43, 161 A.2d 717.]
Here the policy language is clear and unambiguous. As previously noted, it plainly indicates that Zurich is "legally obligated to pay because of a claim first made during the policy period arising out of a medical incident which occurred on or after the retroactive date and which is reported to [Zurich] during the policy period." (emphasis added.) The policy equally makes clear that the "retroactive date" is February 1, 1998. Item No. 1b of the declarations page addresses "additional insured physicians" and refers the insured to the "additional insured physician's endorsement." The "additional insured endorsements" applicable to Jenkins under both the original 1998 and renewal 1999 Zurich policies state in bold letters "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." The endorsement under the original 1998 policy shows a retroactive date of "2/1/98" and an effective date of "2/1/98". Moreover, Jenkins was issued a binder and a certificate of insurance which, similar to the "additional insured physician's endorsement," named Jenkins as an additional insured with an effective policy date of February 1, 1998. Similarly, the endorsement under the 1999 renewal policy repeats the "retroactive date" of "2/1/98" and lists the effective date of renewal as "1/1/99". Furthermore, it is undisputed that a C & R representative explained to Jenkins that the retroactive date of February 1, 1998 was the effective date of coverage.
Admittedly, the "declarations" page of the 1998 Zurich group policy refers to a January 1, 1998 inception date, however, this policy was issued to GSPA and GSPA is the only insured mentioned in the declarations page. Jenkins' name does not appear anywhere on the declarations page of either the 1998 or 1999 group policy and therefore the January 1, 1998 inception date governing GSPA simply does not apply to Jenkins as an additional insured. See Lehrhoff v. Aetna Cas. & Sur. Co., 271 N.J.Super. 340, 346-47, 638 A.2d 889 (App. Div.1994) (noting that the declarations page is tailored to a particular insured and defines coverage available to the insured named therein). See also Martinez v. John Hancock Mut. Life Ins. Co., 145 N.J.Super. *1184 301, 310, 367 A.2d 904 (1976), certif. denied, 74 N.J. 253, 377 A.2d 660 (1977) (finding that an insured is under the minimal duty to read his policies and to advise his insurance agent if the coverage is inconsistent with his desires). Rather, a simple reading of the declarations page directs the insured's attention to the individual endorsement that clearly reflects both a "retroactive date" and effective date of February 1, 1998. The clarity of this provision belies any contrary claim of ambiguity or confusion.
Of course, we enforce unambiguous insurance contracts in accordance with the reasonable expectations of the insured. Sparks, supra, 100 N.J. at 336, 495 A.2d 406. In this case, the insured specifically understood the terms of the policy and got exactly what he bargained for. In fact, the "retroactive date" of February 1, 1998 was set because of representations made by Jenkins both orally and in writing.
In August 1997, Jenkins told the C & R representative that he was presently insured with Princeton and that his coverage with Princeton would expire on February 1, 1998. Shortly after their conversation, on August 18, 1997, Jenkins faxed a completed "Non-Binding Information Quote Form," which represented that his present insurer was Princeton under an "occurrence plus" policy. On this form Jenkins also requested an effective date of "2/98". Along with this form, Jenkins forwarded, among other things, a claims and coverage history form from Princeton dated April 19, 1996, documenting policy periods beginning and ending February 1st of every year from 1987 through 1997. After meeting next with the C & R agent on January 8, 1998, the following day Jenkins prepared, signed and dated an "Individual Physicians Application" for insurance, which represented that his current policy would expire on February 1, 1998. In response to a specific inquiry on the application, Jenkins represented that his professional liability insurance had never been denied, canceled or non-renewed.[3] The application also contained the following language above Jenkins' signature:
I understand that the coverage offered is provided by a claims-made policy and that incidents that occurred prior to the prior acts or retroactive date are not covered and claims reported after the expiration date are not covered unless I purchase or otherwise obtain an extended reporting endorsement provided by Zurich. (emphasis added.)
And on January 12, 1998, in his application for financing of the premium, Jenkins again represented a policy effective date of February 1, 1998.
In sum, we think it plain that the policy as it pertains to Jenkins provides for an effective date of February 1, 1998 that was specifically understood, indeed requested, by the insured as the date on or after which his acts of negligence would be covered if reported during the policy period. The record is devoid of any evidence that the insured expected, bargained, or for that matter, paid for anything more in the way of coverage. We therefore affirm the *1185 motion judge's grant of summary judgment dismissing Jenkins' cross-claims against Zurich.

II
We similarly affirm the grant of summary judgment in favor of C & R, the authorized insurance broker that secured the Zurich policy. Jenkins claimed that C & R was professionally negligent in breaching its duty to procure insurance adequate to meet his needs, namely retroactive coverage to bridge the gap between Princeton's cancellation of its policy and the Zurich's policy inception of February 1, 1998. We disagree.
Without question, insurance brokers and agents owe a fiduciary duty of care to insureds. Avery v. Arthur E. Armitage Agency, 242 N.J.Super. 293, 299, 576 A.2d 907 (App.Div.1990); Sobotor v. Prudential Property & Cas. Ins. Co., 200 N.J.Super. 333, 491 A.2d 737 (App.Div. 1984). In Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 638 A.2d 1288 (1994), the Supreme Court articulated that duty as follows:
One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission .... If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby.
[Id. at 189, 638 A.2d 1288, citing Rider v. Lynch, 42 N.J. 465, 476, 201 A.2d 561 (1964) (emphasis added).]
Thus, liability for breach of that duty can occur (1) if the broker "neglects to procure the insurance," (2) "if the policy is void," (3) if the policy is "materially deficient," or (4) the policy "does not provide the coverage he undertook to supply." Rider v. Lynch, supra, 42 N.J. at 476, 201 A.2d 561. See also Cox v. Santoro, 98 N.J.Super. 360, 365, 237 A.2d 491 (App.Div.1967).
Although these standards applicable to a broker are "minimums," Bates v. Gambino, 72 N.J. 219, 225-26, 370 A.2d 10 (1977); Dimarino v. Wishkin, 195 N.J.Super. 390, 393-94, 479 A.2d 444 (App.Div. 1984), proof of something more than the mere existence of a broker-customer relationship is required to trigger the broker's legal duty. Avery, supra, 242 N.J.Super. at 300, 576 A.2d 907. For instance, in Dimarino, supra, we upheld a finding of liability against a broker who failed to secure coverage for a client after the client expressly advised him that his previous policy had been canceled. By the same token, absent notice or a specific initiating inquiry from the client, it has been held that an insurance broker has no affirmative duty to advise an insured of gaps in his insurance coverage. Hartford Fire Ins. Co. v. N.W. Metal Fabricators, Inc., 793 F.Supp. 954, 957 (D.Or.1992). Cf. Avery, supra, 242 N.J.Super. at 300-02, 576 A.2d 907. The key in determining a broker's liability is whether the broker's conduct invited reliance, or the client's conduct exhibited or justified a claim of reliance. Avery, supra, 242 N.J.Super. at 302, 576 A.2d 907. See also Dancy v. Popp, 232 N.J.Super. 1, 4-5, 556 A.2d 331 (App.Div.1988), aff'd, 114 N.J. 570, 556 A.2d 312 (1989); Cox v. Santoro, supra, 98 N.J.Super. at 365-66, 237 A.2d 491.
The motion judge in this case found no liability as a matter of law:

*1186 It seems more than reasonable that anthat a broker and insurer rely on the customer's assertion that its professional malpractice insurance would expire on 2/98; and, therefore, [C & R] could not be negligent.
In applying these general principles here, we are constrained to consider and weigh the facts most favorably in support of the movant Jenkins' contentions, which were rejected on the basis of C & R's motion for summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Viewed from that perspective, we conclude that reasonable minds could not differ that there was no breach of any legal duty owed by C & R to Jenkins and therefore summary judgment in favor of C & R was properly granted.
Here, there was no evidence that C & R misled Jenkins, incorrectly explained the policy, knew the insured misunderstood the coverage requested and provided, or failed to procure insurance in accordance with the client's needs after being informed about them. In other words, there was no evidence from which a jury could reasonably conclude that the gap in Jenkins' insurance coverage for claims arising from the events of January 3 and 4, 1998 was attributable to C & R's failure to exercise the requisite skill and diligence. On the contrary, the insurance coverage gap was created solely by the intentional actions of the insured of which C & R was not notified.
From the time of Jenkins' first contact with C & R in August of 1997, through January 9, 1998 when he signed the application for insurance, Jenkins consistently advised that his coverage with Princeton would not lapse until February 1, 1998 and that he therefore did not require insurance from Zurich prior to that date. Jenkins even confirmed in writing the existence of coverage with Princeton and requested coverage with Zurich "effective 2/98." Although aware of the notices of pending cancellation issued by Princeton and the insurer's eventual termination of coverage, Jenkins never advised C & R of these events, affirmatively representing exactly the opposite in his application for insurance with Zurich. Singularly aware of Princeton's threatened cancellation, Jenkins failed to make the necessary arrangements to continue the Princeton policy in effect or to secure another policy with retroactive coverage to bridge the gap created by Jenkins' own willful non-payment of insurance premiums. Under these circumstances, in the absence of any expert proofs establishing an industry norm or customary practice, Avery, supra, 242 N.J.Super. at 301, 576 A.2d 907, we hold that a broker breaches no duty to an insured to affirmatively ascertain the existence of any gaps in the insured's coverage and to advise him accordingly. Without proof establishing C & R's liability, the motion judge's grant of summary judgment in its favor was proper.
Our dissenting colleague faults both C & R and Zurich for failing to explain to Jenkins that the Zurich policy would not cover claims made after the effective date of February 1, 1998 that arose from acts prior to the effective date. However, there is absolutely no evidence that Jenkins was unaware of this qualification on coverage. In fact, all the proof is to the contrary. The application signed by Jenkins on January 9, 1998 expressly advised him of the policy's limited retroactivity and in fact offered "prior acts coverage" that, in any event, typically excludes coverage for prior acts if the insured, as here, reasonably should have foreseen the claim. Holmes' Appleman on Insurance, § 111.2 at 116-17 (Holmes and Rhodes ed., 2d ed. 1996). And, as previously noted, the policy itself unambiguously repeats the qualification. *1187 For some reason, the dissent finds this unpersuasive, finding more significant the fact that the actual policy may not have been received until April 1998. However, the claim was not reported by Jenkins to Zurich until eighteen months later, in October 1999 when the renewal policy, issued on January 1, 1999, was in effect for over nine months.
Although properly recognizing that the extent of the duty owed a plaintiff is a matter of law to be determined by a court, the dissent goes on to expand that duty beyond any heretofore recognized in the law to effectively make insurers and their agents guarantors against any gaps in coverage. Even under this expansive view, however, the dissent is forced to acknowledge that Jenkins may have come up far short by virtue of his own actions or negligence. Rosenblum, Inc. v. Adler, 93 N.J. 324, 350-51, 461 A.2d 138 (1983); Martinez v. John Hancock Mut. Life Ins. Co., supra, 145 N.J.Super. at 310, 367 A.2d 904; Schustrin v. Globe Indem. Co., 44 N.J.Super. 462, 466-67, 130 A.2d 897 (App.Div. 1957); see also 16 Appleman, Insurance Law & Practices, § 8834 at 307 (John Alan Appleman and Jean Appleman 1941). Under these circumstances, for reasons stated, we reject the imposition of such a duty on either C & R or Zurich.

III
In light of Zurich's denial of coverage, plaintiff brought a direct action against Jenkins' predecessor insurer, Princeton, alleging negligence for failing to notify St. Barnabas of its cancellation of coverage. The motion judge dismissed this count of plaintiff's complaint finding that she could not maintain a direct cause of action against her tortfeasor's insurer prior to recovery of judgment against the latter. Plaintiff appeals from this determination, and moreover argues, for the first time, that Princeton's termination of its insurance contract with Jenkins was ineffective and therefore coverage should obtain.
Since no declaration of coverage under the Princeton policy was sought in the trial court, the issue of the effectiveness of Princeton's cancellation may not now be reviewed on appeal. See Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973); Conrad v. Robbi, 341 N.J.Super. 424, 447, 775 A.2d 562 (App.Div.), certif. denied, 170 N.J. 210, 785 A.2d 438 (2001). Suffice it to say, however, nothing in the record before this court suggests that Princeton's cancellation of January 9, 1998, retroactive to October 26, 1997, was other than within the boundaries of its policy with Jenkins, the terms of which explicitly provide for cancellation for non-payment of premium.
As to plaintiff's negligence claim against Princeton, it is well recognized that an injured person possesses no direct cause of action against the insurer of the tortfeasor prior to recovery of judgment against the latter. Cruz-Mendez v. ISU/Ins. Servs., 156 N.J. 556, 566-67, 722 A.2d 515 (1999); Manukas v. American Ins. Co., 98 N.J.Super. 522, 524-25, 237 A.2d 898 (App.Div.1968); see also Tuckey v. Harleysville Ins. Co., 236 N.J.Super. 221, 226, 565 A.2d 419 (App.Div.1989). Thus, plaintiff's direct action against Princeton fails to state a claim on which relief could be granted and was therefore properly dismissed.
Even if such a cause of action were recognized, however, the existence of a duty is a question of law to be determined by the court and may appropriately be resolved on a motion for summary judgment, as was done here. See Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527 (1991); Strawn by Strawn v. Canuso, *1188 271 N.J.Super. 88, 100, 638 A.2d 141 (App. Div.1994), aff'd, 140 N.J. 43, 657 A.2d 420 (1995). See also, Huddell v. Levin, 537 F.2d 726 (3rd Cir.1976) (holding that in a negligence case under laws of New Jersey, the preliminary determination of whether a duty exists is for the court); Meistrich v. Casino Arena Attractions, Inc., 54 N.J.Super. 25, 148 A.2d 199 (App.Div.), modified on other grounds, 31 N.J. 44, 155 A.2d 90 (1959).
We have previously held that in the absence of an explicit statutory, regulatory or contract provision that otherwise requires, "neither the insurer nor its agent has a legal duty to give notice of the expiration of a policy ...." Howard Savs. Bank v. Liberty Mut. Ins. Co., 285 N.J.Super. 491, 495, 667 A.2d 390 (App.Div.1995) (citing Citta v. Camden Fire Ins. Assoc., Inc., 152 N.J.Super. 76, 78, 377 A.2d 779 (App.Div.1977)). See e.g., N.J.S.A. 17:29C-1 (requiring insurer to notify mortgage holder of the cancellation of an insurance policy). We know of no authority in this State imposing on medical malpractice liability carriers the duty to notify hospitals of cancellation of insurance coverage for physicians with admitting privileges therein. In our view, neither notions of basic fairness, nor public policy considerations, nor the factual circumstances of this case dictate the judicial creation of such a legal duty, a decision best left to the legislative or executive branches of government. In the absence of any duty on the part of Princeton as a matter of law, the grant of summary judgment in its favor was proper.

IV
Finally, plaintiff sought to impose liability on St. Barnabas for failing to ensure that physicians with admitting privileges have malpractice insurance. The motion judge denied plaintiff leave to amend her complaint to include this additional count of negligence against the hospital, finding no cognizable legal claim. We agree.
Although New Jersey allows for liberal amendment of pleadings, R. 4:9-1, "courts are free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law." Interchange State Bank v. Rinaldi, 303 N.J.Super. 239, 256-57, 696 A.2d 744 (App.Div.1997) (quoting Mustilli v. Mustilli, 287 N.J.Super. 605, 607, 671 A.2d 650 (Ch.Div.1995)). This is because "there is no point to permitting the filing of an amended pleading when a subsequent motion to dismiss must be granted." Ibid. Such is the case here.
It is, of course, the responsibility of the courts to determine the scope of tort liability. See Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993). Before recovery will be allowed under a negligence theory, a defendant must first owe a duty to plaintiff. See Maussner v. Atlantic City Country Club, Inc., 299 N.J.Super. 535, 548, 691 A.2d 826 (App.Div.1997). Here, plaintiff seeks to impose a duty on the hospital on the dual basis that (1) St. Barnabas voluntarily assumed a duty by adopting by-laws requiring physicians with admitting privileges to maintain adequate insurance coverage, cf. Walck v. Johns-Manville Prods. Corp., 56 N.J. 533, 267 A.2d 508 (1970), and (2) as a matter of fairness and policy given the foreseeability of harm from physicians practicing without malpractice insurance, cf. Pfenninger v. Hunterdon Cent. Reg'l High Sch., 167 N.J. 230, 770 A.2d 1126 (2001). Neither basis, however, supports the imposition of a duty as formulated by plaintiff.
In the first place, individual physicians are not required to carry medical malpractice insurance in New Jersey. *1189 Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 87, 698 A.2d 9 (1997). See generally N.J.S.A. 17:30D-1 to -17 (stating provisions related to medical malpractice liability insurance). Nevertheless, courts have upheld the right of a hospital to require members of its medical staff to be covered. Courtney v. Shore Mem'l Hosp., 245 N.J.Super. 138, 584 A.2d 817 (App.Div. 1990). See generally Wanda Ellen Wakefield, Annotation, Propriety of Hospital's Conditioning Physician's Staff Privileges on His Carrying Professional Liability or Malpractice Insurance, 7 A.L.R.4th 1238 (1981). As we stated in Courtney, supra:
[H]ospitals cannot function without rules governing the conduct of the health care providers. Many of the rules are required by law. Others may be dictated by hospital review organizations or generally recognized standards for proper medical care. Whatever their source, if they are reasonable, they are entitled to judicial recognition. (citation omitted) A necessary corollary of this is a recognition of the right of the institution to enforce its rules.
Here we have a by-law requiring that members of the medical staff carry medical malpractice insurance. The reasonableness of this requirement to protect the patient as well as the institution needs no discussion.
[Id. at 142, 584 A.2d 817.]
See also Nanavati v. Burdette Tomlin Mem'l Hosp., 107 N.J. 240, 249-50, 526 A.2d 697 (1987). In recognizing this right, courts rely heavily on the fact that liability insurance coverage is necessary to protect the institution from bearing the financial burden of negligent acts committed by members of its medical staff, or that the hospital was compelled to institute such a requirement at the insistence of its own liability insurance carrier. See, e.g., Pollock v. Methodist Hosp., 392 F.Supp. 393 (E.D.La.1975); Holmes v. Hoemako Hosp., 117 Ariz. 403, 573 P.2d 477 (1977); Renforth v. Fayette Mem'l Hosp. Assoc., 178 Ind.App. 475, 383 N.E.2d 368 (1978), cert. denied, 444 U.S. 930, 100 S.Ct. 273, 62 L.Ed.2d 187 (1979).
It is one thing to say that hospitals should have the right to determine the qualifications of its staff members and to impose conditions on physicians with admitting privileges. It is quite another thing to say, as plaintiff argues here, that such a right, which inures to the hospital's benefit, gives rise to a corresponding duty on the part of hospitals to monitor and enforce the physician's compliance with such requirements for the benefit of patients that the physician admits to the institution.
The by-laws of St. Barnabas impose no such duty on the hospital. Rather, they require physicians with medical staff appointment to furnish proof of professional liability insurance coverage not less than $1,000,000/$3,000,000, and further to notify the hospital if such insurance is canceled or otherwise allowed to lapse. As noted, although Jenkins provided St. Barnabas with proof of insurance on January 31, 1997 for a coverage period indicated through January 1998, he admittedly never advised the hospital that his policy had been canceled for non-payment of premium effective October 26, 1997. The point is that St. Barnabas' by-laws clearly placed the burden of compliance on the shoulders on those uniquely situated and in a superior positionthe physiciansas a rightful condition for initial appointment and continuing privileges. For obvious reasons, the hospital assumed no concomitant affirmative responsibility for monitoring the level of physician compliance, confirming the insurance coverage as represented, verifying that no cancellation or lapse has occurred, or ensuring *1190 that its staff and admitting physicians continue to make timely premium payments on an ongoing basis.
Indeed, the record is devoid of proof of any proactive steps taken by St. Barnabas on behalf of its patients from which it can be inferred that the hospital owes a duty of reasonable care to patrons to implement its by-laws properly, much less to protect them from physicians without malpractice insurance who admit them through its doors. Cf. Maussner v. Atlantic City Country Club, Inc., 299 N.J.Super. 535, 553, 691 A.2d 826 (App. Div.1997). Simply put, in the absence of an obligation to act, investigate, or "check-up" on its physicians, there is no voluntarily-assumed duty.
Nor does such a duty arise from the common law. While a hospital may be liable vicariously for the negligence of a staff physician, Corleto v. Shore Mem'l Hosp., 138 N.J.Super. 302, 306, 350 A.2d 534 (Law Div.1975), and directly for its selection and appointment of an unqualified, unskilled or incompetent physician, id. at 308-09, 350 A.2d 534; Darling v. Charleston Cmty. Mem'l Hosp., 33 Ill.2d 326, 211 N.E.2d 253 (1965), cert. denied, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966); Jack W. Shaw, Jr., Annotation, Hospital's Liability for Negligence in Selection or Appointment of Staff Physician or Surgeon, 51 A.L.R.3d 981 (1973), tort liability has never been extended to encompass a duty running from hospital to patient as formulated by plaintiff here, namely to ensure that physicians with mere admitting privileges have malpractice insurance. The only two cases we have discovered that relied on such a theory of liability involved a situation where the hospital granted staff privileges to a doctor knowing he had no medical malpractice insurance and was otherwise not financially responsible under a state law mandating financial responsibility as a condition of a physician's ability to maintain staff privileges at a hospital. Robert v. Paschall, 767 So.2d 1227 (Fla.Dist.Ct.App. 2000), review denied, 786 So.2d 1187 (Fla. 2001); Baker v. Tenet Healthsys. Hosps., Inc., 780 So.2d 170 (Fla.Dist.Ct.App.2001); accord, Benjamin J. Vernia, Annotation, 98 A.L.R.5th 533 (2002). Here, however, Jenkins is not a hospital employee but merely a physician with admitting privileges. Moreover, there is no claim that St. Barnabas knew his insurance had been canceled and, to the contrary, was assured otherwise by the doctor. Most significant, however, unlike Florida, New Jersey imposes no statutory duty on the hospital to assure its physicians, much less those only with admitting privileges, have malpractice insurance.
Recognizing that no such duty exists under the common law either, plaintiff nevertheless seeks to come under the umbrella of those cases finding corporate negligence in the selection or retention of unqualified physicians, arguing that physicians without insurance are "incompetent." This argument is unpersuasive. We discern no reasonable correlation between a physician who does not carry malpractice insurance and his or her professional competency. Although some doctors may be unable to obtain coverage because of past malpractice, for purposes of determining the existence of a duty, a major consideration of which is the foreseeability of harm, Alloway v. Bradlees, Inc., 157 N.J. 221, 230, 723 A.2d 960 (1999), we see no greater risk of injury to the patient created by a physician who, as here, has allowed a short-term gap in his insurance coverage and, because of that lapse, has become non-compliant with the hospital's internal rules.
In determining whether such a duty exists, we have also considered (1) the attenuated *1191 relationship between the hospital and physicians with mere admitting privileges; (2) the nature of the attendant risk which, as noted, seems minimal inasmuch as a deficiency in professional liability insurance has little, if anything, to do with professional competence; (3) the opportunity and ability of St. Barnabas to patrol enforcement of its regulations, which presumably would be both burdensome and cost-prohibitive; and (4) "the public interest in the proposed solution." Hopkins v. Fox & Lazo Realtors, supra, 132 N.J. at 439, 625 A.2d 1110. After weighing and balancing these several factors, we soundly reject the invitation to extend the common law to encompass a duty as formulated by plaintiff. Neither fairness nor policy dictates judicial imposition of such a duty. Rather, we leave such a determination to the legislative or executive branches of government.
Therefore, we affirm the denial of plaintiff's motion for leave to amend her pleadings to include a count of negligence against St. Barnabas on this novel theory of liability. We also affirm the grant of summary judgment in favor of Zurich declaring no coverage, and in favor of C & R and Princeton, finding no liability as a matter of law.
Affirmed.
LANDAU, J.A.D., retired and temporarily assigned on recall, dissenting and concurring.
Respectfully, I write to dissent in part from the majority opinion and to enter a concurrence with a portion of that opinion. Except for the differences noted below, I am in agreement with my colleagues.
I concur with the majority's affirmance of the grant of summary judgment in favor of Princeton Insurance Company (Princeton) against Deborah and Perry President. In granting that judgment, the motion judge pointed out that the Presidents did not avail themselves of his previously tendered opportunity to amend their complaint against Princeton to include a count for declaratory relief respecting the effectiveness of its cancellation of Dr. Jenkins' policy by a notice dated after the alleged malpractice incident, but retroactive to a date preceding the incident.[1] My concurrence is based on that reason stated by the motion judge. However, given the strong public policy expressed by the legislature favoring medical malpractice insurance, see Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 87 n. 1, 698 A.2d 9 (1997), and in light of the views expressed below respecting the award of summary judgment to Princeton against Dr. Jenkins, I question the majority's dispositive reliance upon the applicability of cases such as Cruz-Mendez v. ISU/Ins. Servs. of San Francisco and Fireworks by Girone, Inc., 156 N.J. 556, 566-67, 722 A.2d 515 (1999), in a case where the question of efficacy of a retroactive policy cancellation would be critical to the injured third party. I agree with the majority's affirmance as to the issue of Princeton's asserted duty to notify St. Barnabas, inasmuch as the legislature has not seen fit to enact a provision mandating malpractice insurance coverage for physicians. See Princeton Ins. Co. v. Chunmuang, supra, 151 N.J. at 87, 698 A.2d 9.
My partial dissent is directed to the judgments afforded to both C & R Insurance Agency and Zurich Insurance Company on the claims of Dr. Jenkins and the Presidents, and to the summary judgment afforded to Princeton on Dr. Jenkins' claim. Some additional factual issues disclosed by the record are pertinent.
*1192 As the majority notes, C & R itself created the Garden State Physicians Alliance (GSPA) to establish a "Risk Group." There was one master policy with Zurich for the group. C & R was the agent for Zurich, which the record indicates, is now C & R's controlling shareholder, although apparently not controlling during 1997 and 1998. The person who signed the formal binder given to Dr. Jenkins on behalf of Zurich as its authorized representative was both a C & R principal and the President of GSPA.
Dr. Jenkins was solicited by a C & R representative named O'Brien while his insurance with Princeton was in full force and effect. Portions of the record, if believed, establish that on January 8, 1998, during a final pre-application meeting, Dr. Jenkins informed O'Brien that he owed money to Princeton on the occurrence policy. O'Brien merely told Jenkins to pay the money due to Princeton. There is nothing in the record to show that O'Brien ever explained that, despite its "claims made" designation, the Zurich policy would not cover claims made after the effective date that arose from events prior to a "retroactive date."
I believe that C & R, Zurich's agent, must be charged with knowledge on January 8, 1998, that Jenkins' occurrence policy with Princeton was then in jeopardy.
It is also not at all clear that Dr. Jenkins knew on January 8, 1998, that the Princeton policy would be canceled or the date which would ultimately be selected by Princeton as the date of cancellation. Had Jenkins then known that the effective date of cancellation by Princeton would be retroactive to October 26, 1997, that knowledge, and knowledge of the meaning of the phrase "retroactive date," would have been critical to decisions made respecting utilization of the February 1, 1998 date selected for inception of the Zurich coverage.
Although the malpractice alleged by the Presidents occurred on January 3 and 4, 1998, no claims were made until over a year later when Zurich's second policy period with Dr. Jenkins was in effect. On the date that O'Brien and Jenkins met, Jenkins probably would not yet have received notice of the Princeton cancellation effective October 26, 1997. That notice was dated January 9, 1998, presumably received several days later. However, the record discloses existence of a prior Princeton notice dated January 8, 1998, date of receipt unknown, that stated a policy cancellation effective February 1, 1998. In fact, notwithstanding the October 26, 1997, retroactive cancellation date in the final notice dated January 9, 1998, it appears that Princeton had issued a renewal certificate as of December 30, 1997, and issued a bill for a policy beginning February 1, 1998. The January 8 and January 9 notices followed.
I do not believe the motion judge or the majority have adequately considered the import of these facts. While Princeton may indeed have been entitled to cancel the Jenkins' policy for nonpayment, its authority for effecting a retroactive cancellation is not clear to me, and particularly so where the notice of such cancellation does not appear to have been provided until after the incident of January 3-4.
Since Rider v. Lynch, 42 N.J. 465, 476, 201 A.2d 561 (1964), our common law has provided increased guidance for fixing the standard of care owed by an insurance broker or agent to an insured as well as a corresponding duty to third parties foreseeably harmed by the absence of coverage for a tortfeasor.
In a negligence case, establishment of the existence and extent of duty owed to a plaintiff is a matter of law to be determined by a court. Burroughs v. City of *1193 Atlantic City, 234 N.J.Super. 208, 221, 560 A.2d 725 (App.Div.), certif. denied, 117 N.J. 647, 569 A.2d 1345 (1989). New Jersey courts have recognized that the peculiar circumstances of a case will govern whether liability of an insurance broker or agent can be established without requiring an expert. Bates v. Gambino, 72 N.J. 219, 224-25, 370 A.2d 10 (1977); Rider v. Lynch, supra, 42 N.J. at 476, 201 A.2d 561; Indus. Dev. Assoc. v. F.T.P., Inc., 248 N.J.Super. 468, 470-71, 591 A.2d 682 (App. Div.1991), aff'd, sub. nom. Indus. Dev. Assoc., Inc. v. Commercial Union Surplus Lines Ins. Co., 127 N.J. 94, 95, 602 A.2d 733 (1992). I do not believe an expert is necessary in the circumstances disclosed by the record.
O'Brien, the C & R representative, admittedly solicited and later convinced Dr. Jenkins to switch to the Zurich claims made policy. There is no indication of a timely oral or written explanation of the effect of the words "retroactive date," which qualify the Zurich policy.
On January 8, 1998, both O'Brien and Dr. Jenkins each knew of the premium payment problem with Princeton. The proofs tend to show, however, that Jenkins did not yet know the Princeton policy would be canceled or terminated earlier than February 1, 1998. However, even if Jenkins was aware of an earlier cancellation date, the record does not establish that he was informed of the meaning and effect of the "retroactive date" qualification. "Retroactive date" is surely not synonymous with "effective date." When asked in his deposition whether he explained to Dr. Jenkins what a retroactive date meant, O'Brien responded: "Yes ... I told him, `this is the effective date of coverage,' which is February 1, 1998, the date he requested for coverage."
I do not believe that an expert report is required for a trier of fact to understand that, absent an explanation that incidents occurring prior to the retroactive date are not covered, a lay person could reasonably believe that claims for such incidents made after the effective date of a claims made policy would be covered. O'Brien's explanation did not preclude that possible misapprehension.
Holmes' Appleman on Insurance points up the problem in this case. It states,
In general, claims made means that the claim must be reported during the policy period for it to be covered. Most `claims made' policies include coverage for actions which occurred before the policy period provided the insured has given a truthful history as asked in the application process. This is known as full prior acts coverage. Some policies specify a retroactive date and preclude coverage for losses occurring before that date. This is the so-called `retro' date.
Other policies may exclude coverage for prior acts in some form or other. For example, a claims-made policy may exclude coverage for acts occurring prior to the effective date of the policy if the insured know of or reasonably should have foreseen the claim.
[15 Eric Mills Holmes, Holmes' Appleman on Insurance, § 111.2 at 116-117 (2d ed. 2000).]
After discussing differences between occurrence and claims made policies, the Appleman Treatise goes on to state,
If, five years later, claim is made against the insured for bodily injury resulting from exposure during the earlier policy periods, the claim will not be covered under any policy other than the one, if any, in effect at the time claim is made.
However, the foregoing description is somewhat oversimplified. It ignores two claims-made features that can reintroduce some or all of the uncertainty *1194 associated with the occurrence trigger. These features are the retroactive date (mentioned earlier) and extended reporting periods.... [I]t will suffice to say that because of the options that these features allow (both for insureds and insurer), anyone working with the new claims-made form must acquire proficiency in arranging claims-made coverage. Failure to do so can result in uninsured losses for the insured, errors and omissions claims against producers, and the insurer's failure to collect an adequate premium. (Emphasis added.)

[Id. at 119.]
Here, Dr. Jenkins, who was already insured, was solicited by C & R to change his insurance to a form of policy where the very existence of coverage is intensely fact and date sensitive. This presents a compelling basis for charging C & R, and, I believe, its insurer Zurich with the duty to make sure that the insured is aware of the significance of crucial terms such as "effective date," and "retroactive date." As noted in Appleman, the classic claims made policy would cover a claim that was made after the policy's effective date if the alleged negligence occurred prior to that effective date. Surely, there is a duty to communicate the effect of words that qualify the ordinary provisions of a claims made policy, such as the words "retroactive date." I believe this duty is owed by the agent, particularly one who has solicited a change in coverage, and by the insurer, who should explain the import of such qualifications in any documents given to the insured in timely fashion.
It has been suggested that Dr. Jenkins elected, in effect, to take a chance, by either misrepresenting the date when his Princeton insurance expired, or by simply electing to take his chances on leaving a gap in coverage. Perhaps so, but I do not find a basis in the record for utilizing this rationale on a motion for summary judgment. In fact, on January 8, 1998, Dr. Jenkins' last contact with O'Brien prior to submitting his application on January 9, the only documents that appear likely to have been in his possession indicated that the Princeton policy would be canceled as of February 1, 1998. The retroactive cancellation was dated January 9, 1998, and presumably received shortly thereafter. Of course, it might be said that Jenkins should have informed C & R when he received the subsequent retroactive cancellation. However, unless he understood that he would be receiving coverage containing a "retroactive date" and also understood that this would mean that there was no coverage for any losses arising before said date, a reasonable person might well have assumed that he would be covered under a claims made policy after the "effective date" for claims subsequently made that arose out of events preceding the effective date.
The scope of duties owed by an insurance agent or broker to an insured in fulfillment of its responsibility to act with reasonable skill and diligence has been extensively outlined in Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 188-90, 638 A.2d 1288 (1994). It is unnecessary to here repeat the authorities cited in Carter. Although the issue of due care in given circumstances is certainly fact sensitive, I believe that if the facts are as above stated, C & R and indeed Zurich, should be found to have breached an actionable duty to Dr. Jenkins as well as to the Presidents, who are persons within the foreseeable ambit of injury resulting from that breach.
Authority for extending the duty to the Presidents, as persons allegedly injured by Dr. Jenkins' malpractice, is amply provided in Carter, supra, 135 N.J. at 194-98, *1195 638 A.2d 1288, as well as in cases like Werrmann v. Aratusa, Ltd., 266 N.J.Super. 471, 474-75, 630 A.2d 302 (App.Div. 1993); Walker v. Atl. Chrysler Plymouth, Inc., 216 N.J.Super. 255, 261-62, 523 A.2d 665 (App.Div.1987); and Eschle v. Eastern Freight Ways, Inc., 128 N.J.Super. 299, 304-06, 319 A.2d 786 (Law Div.1974).
I am concerned, too, with the motion judge's heavy reliance upon the lack of ambiguity in the insurance documents respecting the effect of use of the term "retroactive date." Concededly, the policy language is not ambiguous to me. That issue is academic, however, as the policy was not sent to Jenkins until April of 1998, well after anything could have been done to correct its impact upon events of January 3 and 4, 1998. Moreover, the documents provided to Jenkins do not pass muster under our opinion in Lehrhoff v. Aetna Cas. and Sur. Co., 271 N.J.Super. 340, 346-50, 638 A.2d 889 (App.Div.1994). The only confirmation of Jenkins' coverage with Zurich until April 1998, were two documents that I would deem effectively comparable to the declarations page considered in Lehrhoff, and that failed to warn the insured of the limitation imposed by the words "retroactive date." The two documents received by Dr. Jenkins were a binder and a "Certificate of Insurance," each a one-page document containing a number of somewhat confusing dates. The binder recites 1/01/98 as the beginning of the "policy period," but 02/01/98 as the date of the binder that runs to 4/01/98. The "retroactive date" is indeed set forth as February 1, 1998, but the meaning of that term as compared to "effective date" is not explained in the documents, and, as indicated by O'Brien's deposition testimony, does not appear to have been properly explained to Dr. Jenkins.
Based upon the foregoing considerations, I would reverse the grants of summary judgment to both C & R and Zurich.
I would also reverse the award of summary judgment in favor of Princeton against Dr. Jenkins inasmuch as it is at least disputable when he knew or should have known that his policy was canceled effective October 26, 1997. Ordinarily, a cancellation voids a policy prospectively. See, e.g., First Amer. Title Ins. Co. v. Lawson, 351 N.J.Super. 407, 422, 798 A.2d 661 (App.Div.), certif. granted, 174 N.J. 357, 807 A.2d 191 (2002).
I would not, however, grant summary judgment to the Presidents or Dr. Jenkins on their claims. A review of the deposition testimony of Dr. Jenkins shows that he appeared uncertain as to relevant dates, and this might be deemed by a trier of fact to suggest his awareness of a lack of coverage under either policy for events occurring in January 1998.
NOTES
[1] Perry President brought his claim per quod.
[2] Ordinarily, in a "claims made" policy, the coverage is effective if the negligent or omitted act is discovered and brought to the attention of the insurance company during the period of the policy, no matter when the act occurred. In an "occurrence" policy, the coverage is effective if the negligent or omitted act occurred during the period of the policy, whatever the date of discovery. Zuckerman v. Nat. Union Fire Ins. Co., 100 N.J. 304, 310, 495 A.2d 395 (1985). Therefore, the "occurrence" policy provides unlimited prospective coverage and no retroactive coverage at all, while the "claims made" policy usually provides unlimited retroactive coverage and no prospective coverage at all. Ibid.
[3] At the time he filled out the application for insurance on January 9, 1998, Jenkins apparently believed that although he was "behind one payment", he had not been terminated by Princeton. He also never advised Zurich or C & R of Princeton's notice of cancellation or the actual termination of insurance, believing that his coverage with Princeton would be reinstated upon satisfaction of the late premium payment. Despite this belief, Jenkins never attempted to make the remaining payment to Princeton because he was "trying to manage [his] finance at the time." Jenkins also admits that he did not ask Zurich or C & R to have the policy with Zurich start a month earlier than the typical start date for medical malpractice coverage.
[1] An amended complaint was filed on behalf of the Presidents, asserting only Princeton's negligence in failing to notify St. Barnabas Hospital of the policy cancellation.