853 A.2d 247

DEBORAH PRESIDENT AND PERRY PRESIDENT, PLAINTIFFS, v. DR. REGINALD JENKINS, DEFENDANT–APPELLANT, AND ST. BARNABAS MEDICAL CENTER, DR. LAMBERTO FLORES, DR. FRANCINE HUGHES, DR. JOHN DOE, DR. ROBERT ROE, (FICTITIOUS NAME), SALLY SMITH (FICTITIOUS NAME), XYZ BROKERAGE AGENCY, (FICTITIOUS NAME) AND PRINCETON INSURANCE COMPANY, DEFENDANTS, AND C & R INSURANCE AGENCY AND ZURICH INSURANCE COMPANY, DEFENDANTS–RESPONDENTS.

Argued January 6, 2004—Decided August 4, 2004.

552

*Hugh P. Francis* argued the cause for appellant (*Francis & Berry,* attorneys; *Peter A. Olsen,* on the brief).

*Eric L. Harrison* argued the cause for respondent C & R Insurance Agency (*Methfessel & Werbel,* attorneys).

*Kevin T. Coughlin* argued the cause for respondent Zurich American Insurance Company (*McElroy, Deutsch & Mulvaney,* attorneys; *Robert W. Muilenberg* and *David D. Hess,* on the brief).

*Nooshin Namazi* submitted a brief on behalf of *amicus curiae,* Professional Insurance agents of New Jersey (*Nicoletti, Hornig, Campise, Sweeney & Paige,* attorneys; *David H. Paige,* a member of the New York bar, on the brief).

Justice WALLACE delivered the opinion of the Court.

In this insurance case, we consider two separate issues: (1) whether a "claims made" professional liability insurance policy issued by a successor insurer provides coverage for an asserted claim against its insured, and (2) whether the insurance agent breached its duty of care in procuring the policy for the insured. The trial court granted summary judgment in favor of both the insurer and the agent. The Appellate Division affirmed. *President v. Jenkins,* 357 *N.J.Super.* 288, 814 *A.*2d 1173 (2003). Because of a dissent in the Appellate Division, *id.* at 318–325, 814 *A.*2d 1173, the case is before us as a matter of right, *R.* 2:2–1(a)(2). Prior to argument, we accorded *amicus curiae* status to the Professional Insurance Agents of New Jersey (Agents). We now conclude that the insurance documents received by the insured were ambiguous and that the evidence presented an issue of material fact concerning the insured's reasonable expectations. However, we also conclude that the insurance agent breached no duty of care to the insured. Consequently, we reverse in part and affirm in part.

## I.

The material facts are these. Dr. Reginald Jenkins, a medical doctor specializing in obstetrics and gynecology, had hospital privileges at St. Barnabas Medical Center. In February 1987, he obtained medical malpractice coverage with Princeton Insurance Company (Princeton) under an "occurrence" policy that was renewed for successive one-year periods through February 1998. Generally, an "occurrence" policy provides coverage for any asserted misconduct that occurs during the policy period, even if the claim is asserted after the policy expires.

In the Fall of 1997, Princeton informed Dr. Jenkins that it would cancel his insurance policy unless he paid his overdue premium. Dr. Jenkins failed to pay and Princeton notified him of the cancellation, retroactive to October 26, 1997, in a letter dated January 9, 1998. Consequently, the Princeton policy expired on October 26, 1997, instead of February 8, 1998.

In August 1997, Dr. Jenkins had discussed obtaining replacement medical malpractice insurance with Patrick O'Brien, a sales representative for C & R Insurance Agency (C & R). O'Brien informed Dr. Jenkins that he was an agent for Zurich Insurance Company (Zurich) and offered to sell him insurance coverage. Dr. Jenkins explained that he was currently insured by Princeton, but that his policy would expire at the beginning of February 1998. He completed a "Non–Binding Information Quote Form" and indicated that he was insured with Princeton under an "occurrence plus" policy and would require new coverage effective February 1998.

On January 8, 1998, Dr. Jenkins met with O'Brien and completed and signed an insurance application. However, Dr. Jenkins did not answer the questions concerning his requested effective date of coverage, insurance history for the previous three years, and whether his present coverage was "claims made." Dr. Jenkins indicated that his Princeton insurance policy expired on February 1, 1998, and that his professional liability insurance had never been "denied, cancelled, or not renewed." His signature appeared beneath the following statement:

> I understand that the coverage offered is provided by a claims-made policy and that *incidents that occurred prior to the prior acts or retroactive date are not covered* and claims reported after the expiration date are not covered unless I purchase or otherwise obtain an extended reporting endorsement by Zurich.

At the meeting, Dr. Jenkins also asked O'Brien what he should do about the final payment he owed Princeton. O'Brien advised him to pay the premium promptly. Dr. Jenkins failed to pay the premium and never informed O'Brien that his Princeton policy was cancelled prior to February 1, 1998.

On January 12, 1998, Dr. Jenkins applied to Credit Corporation (AFCO) to finance his Zurich premium. The finance agreement, which Dr. Jenkins signed, dated, and faxed to C & R, noted the effective date of the Zurich policy was February 1, 1998.

Sometime later, Zurich, through C & R, issued Dr. Jenkins a binder, a certificate of insurance (certificate), and an additional insured physician's endorsement # 1 (endorsement # 1). The binder listed Dr. Jenkins as the insured and Zurich as the insurer. It identified February 1, 1998, to April 1, 1998, as the binder period, January 1, 1998, to January 1, 1999, as the policy period, and February 1, 1998, as the retroactive date. The certificate, which also named Dr. Jenkins as the insured and Zurich as the insurer, set February 1, 1998, as the policy's effective date, and January 1, 1999, as the policy's expiration date. The endorsement named Garden State Physicians Alliance (GSPA) [1] as the insured and Dr. Jenkins as an additional insured physician, with a retroactive date of February 1, 1998. It also set January 1, 1998, as the effective date of the policy, January 1, 1999, as the expiration date of the policy, and February 1, 1998, as the effective date of the endorsement.

C & R mailed Dr. Jenkins the Zurich insurance policy in April 1998. The cover letter declared the policy was written on a "claims-made basis" and included an extended reporting period at no additional premium charge. Further, the letter instructed Dr. Jenkins to "review the policy carefully making sure that all information disclosed on the Endorsement Pages is correct."

The Zurich policy's cover page displayed in bold print the following notice near the top of the page: "THIS POLICY PRO-

---

[1] Zurich does not issue medical malpractice insurance directly to individual physicians. GSPA was created for the express purpose of procuring liability insurance for its member health care professionals on a group basis. When a new physician was added to the policy, an endorsement was issued containing a "retroactive date," identical to the effective date of the endorsement, on which the additional insured physician would be entitled to insurance under the master policy as an additional insured.

VIDES CLAIMS MADE COVERAGE. CLAIMS MUST FIRST BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND MUST BE REPORTED IN WRITING TO THE ZURICH INSURANCE COMPANY DURING THE POLICY PERIOD. PLEASE READ THE ENTIRE POLICY CARE-FULLY." Under the main heading of "Insuring Agreements" and the subheading of "Coverage Provided," the cover page contained the following:

> Coverage B—Physician Professional Liability: We will pay on behalf of a physician, damages that the physician shall become legally obligated to pay because of a claim first made *during the policy period arising out of a medical incident which occurred on or after the retroactive date* and which is reported to us during the policy period.
>
> [ (Emphasis added).]

The policy defined "policy period" as "the period of coverage that begins at 12:01 a.m. on the inception date shown in the Declarations and ends at 12:01 a.m. on the expiration date or effective date of cancellation of this policy. The policy period does not include any extended reporting period." There was a reference in the coverage section limiting coverage to medical incidents that occurred after the retroactive date. However, the retroactive date was neither defined nor set forth in the policy.

With the policy, Dr. Jenkins received a declarations page for the group policy with GSPA as the named insured. It contained, in bold face, the reference to "claims made" coverage and listed a policy period from January 1, 1998, to January 1, 1999, with a retroactive date of January 1, 1997. Dr. Jenkins renewed the Zurich policy at the end of 1998 for the calendar year 1999.

A summary of the various dates on the insurance documents is as follows:

### Summary of Insurance Documents

*Binder:*

    Date of Issuance: 01/01/98
    Insurer: Zurich Insured: Dr. Jenkins
    Binder Period: 02/01/98 to 04/01/98
    Retroactive Date: 02/01/98

Policy Period: 01/01/98 to 01/01/99

*Certificate of Insurance:*
    Date: 01/08/98
    Insurer: Zurich Insured: Dr. Jenkins
    Policy Effective Date: 02/01/98
    Policy Expiration Date: 01/01/99
*Endorsement # 1:*
    Insured: GSPA
    Additional Insured Physician: Dr. Jenkins
    Effective Date of Policy: 01/01/98
    Expiration Date of Policy: 01/01/99
    Effective Date of Endorsement: 02/01/98
    Retroactive Date: 02/01/98
*Endorsements # 2—# 4; Policy Schedule:*
    Insured: GSPA
    Effective Date of Policy: 01/01/98
    Expiration Date of Policy: 01/01/99
    Effective Date of Endorsement: 02/01/98
*AFCO: Commercial Premium Finance Agreement:*
    Date: 01/12/98
    Insurer: Zurich Insured: Dr. Jenkins
    Effective Date of Policy: 02/01/98
*1998 Declarations Page for Group Policy:*
    Insured: GSPA
    Policy Period: 01/01/98 to 01/01/99
    Retroactive Date: 01/01/97
*1999 Declarations Page for Group Policy:*
    Insured: GSPA
    Policy Period: 01/01/99 to 01/01/00
    Retroactive Date: 01/01/97

On September 20, 1999, plaintiffs, Deborah and Perry President, filed a medical malpractice complaint against Dr. Jenkins based on injuries resulting from alleged negligence that occurred on January 3 and 4, 1998. Dr. Jenkins forwarded the complaint to Zurich to provide representation. Zurich declined coverage because the incident occurred prior to the policy's February 1, 1998, retroactive date.

Thereafter, plaintiffs amended their complaint several times to name as defendants: (1) St. Barnabas Medical Center, (2) two resident physicians, Doctors Lamberto Flores and Francine Hughes, (3) Princeton, (4) Zurich, and (5) C & R. Dr. Jenkins obtained counsel and answered the complaint, denying he was negligent in the treatment of Deborah President.

The claims were dismissed against all defendants except Dr. Jenkins. Dr. Jenkins amended his answer to include cross claims against Zurich and C & R. Zurich and C & R each moved for summary judgment and submitted documentation to demonstrate that Zurich provided no coverage prior to February 1, 1998, and that Dr. Jenkins informed C & R that his coverage with Princeton did not expire until February 1, 1998.

In a cross-motion for summary judgment against Zurich and C & R, Dr. Jenkins certified that when he initially contacted C & R, he explained that he needed coverage starting in February 1998. He claimed that O'Brien never questioned that date and failed to advise him of the availability of coverage to fill any gap that might have existed between the end of the Princeton coverage and commencement of the Zurich coverage. Dr. Jenkins asserted that when he received the binder from Zurich, he believed that the policy became effective January 1, 1998—the date listed as the effective date of the policy. He claimed not to understand what was meant by "the binder period ran from February 1, 1998 to April 1, 1998," and not to comprehend the significance of a retroactive date. He also asserted that he stressed to O'Brien that he was concerned about gaps in his insurance coverage and expected to receive coverage that was adequate to meet his needs. Further, he maintained that O'Brien never discussed or explained the significance of the GSPA.

The trial court denied Dr. Jenkins's cross-motion for summary judgment and dismissed all claims against Zurich and C & R. Thereafter, Dr. Jenkins settled with plaintiffs.

The Appellate Division affirmed the trial court's judgment with one member of the panel dissenting. *President, supra,* 357

*N.J.Super.* at 318, 814 *A.2d* 1173. The majority concluded that Dr. Jenkins's malpractice insurance policy with Zurich did not cover plaintiffs' claim and that C & R did not breach a professional duty of care in failing to bridge Dr. Jenkins's insurance coverage gap. *Id.* at 295, 814 *A.2d* 1173. The majority rejected Dr. Jenkins's claim that the Zurich policy was ambiguous and inconsistent with his reasonable expectations. *Id.* at 303–304, 814 *A.2d* 1173. The court found the policy clearly limited coverage to incidents that occurred on or after the February 1, 1998, retroactive date, which was exactly what Dr. Jenkins had requested. *Id.* at 304–06, 814 *A.2d* 1173.

With respect to C & R, the majority found there was no evidence from which a jury could reasonably conclude that Dr. Jenkins's insurance coverage gap was attributable to C & R's failure to exercise the requisite skill and diligence in procuring coverage. *Id.* at 309–10, 814 *A.2d* 1173. Rather, the majority faulted Dr. Jenkins for failing to inform C & R that his Princeton insurance policy was cancelled or in danger of being cancelled. *Id.* at 310, 814 *A.2d* 1173. The majority concluded that absent "expert proofs establishing an industry norm or customary practice," C & R did not owe Dr. Jenkins a duty "to affirmatively ascertain the existence of any gaps in [his] coverage and to advise him accordingly." *Ibid.*

The dissent concluded it was error to grant summary judgment in favor of Zurich, C & R, and Princeton.[2] *Id.* at 325, 814 *A.2d* 1173. Regarding Zurich, the dissent was concerned with the trial court's "heavy reliance upon the lack of ambiguity in the insurance documents respecting the effect of [the] use of the term 'retroactive date.'" *Id.* at 324, 814 *A.2d* 1173. The dissent noted that none of the insurance documents defined "retroactive date," or distinguished that term from the policy's "effective date," rendering it

---

[2] Dr. Jenkins did not assert claims against Princeton in the trial court, the Appellate Division, or in his brief before this Court. Additionally, the plaintiffs dismissed their notice of appeal as to Princeton without prejudice. Therefore, Princeton is not a party in the dispute.

ambiguous. *Ibid.* The dissent also found that O'Brien's explanation of the meaning of "retroactive date," "did not preclude [a] possible misapprehension." *Id.* at 322, 814 *A.*2d 1173. With respect to C & R, the dissent found that an expert report was not required "for a trier of fact to understand that, absent an explanation that incidents occurring prior to the retroactive date are not covered, a lay person could reasonably believe that claims for such incidents made after the effective date of a claims made policy would be covered." *Id.* at 321–22, 814 *A.*2d 1173.

## II.

### A.

Dr. Jenkins argues that the Zurich policy is ambiguous and should therefore be construed in his favor. He contends that the use of the term "retroactive" is misleading and that neither the agent nor the policy language explained its significance. He argues that an insured would have to scrutinize the coverage section of the policy to realize that, contrary to the bold face print at the top of the page, it is not enough for a claim to be made and reported during the policy period. In addition, he argues that when he renewed his policy in December 1999, the declarations page contained a January 1, 1997, retroactive date; thus, the Presidents' claim should be covered under the policy. Dr. Jenkins maintains that he reasonably expected that the "claims made" policy would cover all medical incident claims reported during the policy period regardless of when those incidents arose. He acknowledges he requested coverage starting February 1, 1998, but argues that he believed he would receive the benefit of retroactive coverage commonly associated with a "claims made" policy. He argues that Zurich's interpretation is contrary to the natural understanding of a "claims made" policy and eviscerates the *quid pro quo* of a limited reporting period in exchange for unlimited retroactive coverage that is an essential attribute of "claims made" policies.

Zurich argues that the terms of the policy are clear and unambiguous, with coverage limited to medical incidents that occurred on or after the retroactive date, which the policy established as February 1, 1998. Zurich maintains that a retroactive date tailored to each physician is consistent with the risk purchasing group master policy that allows individual doctors to pool their risk for lower rates. As individual doctors are added to the policy, the endorsement shows that the new doctor's start date becomes the retroactive date under that policy. Zurich also disputes Dr. Jenkins's claim that the January 1, 1997, retroactive date on the declarations page created an ambiguity. Rather, Zurich urges that the declarations page makes it clear that the information on that page applied to only GSPA, and that individual physicians needed to refer to the endorsement for their information. Zurich states that Dr. Jenkins's information was in endorsement # 1, which showed a February 1, 1998, retroactive date. In sum, Zurich claims that Dr. Jenkins received the coverage he expected—"claims made" coverage after the retroactive date of February 1, 1998, when his Princeton "occurrence" policy was scheduled to terminate.

### B.

When interpreting an insurance policy, courts should give the policy's words "their plain, ordinary meaning." *Zacarias v. Allstate Ins. Co.*, 168 *N.J.* 590, 595, 775 *A.2d* 1262 (2001). If the policy terms are clear, courts should interpret the policy as written and avoid writing a better insurance policy than the one purchased. *Gibson v. Callaghan*, 158 *N.J.* 662, 670, 730 *A.2d* 1278 (1999). Nevertheless, we recognize that an insurance policy is a " 'contract[ ] of adhesion between parties who are not equally situated.' " *Doto v. Russo*, 140 *N.J.* 544, 555, 659 *A.2d* 1371 (1995) (quoting *Meier v. New Jersey Life Ins. Co.*, 101 *N.J.* 597, 611, 503 *A.2d* 862 (1986)). Such policies are often "prepared unilaterally by the insurer, and have always been subjected to careful judicial scrutiny to avoid injury to the public." *Sparks v. St. Paul Ins.*

*Co.,* 100 *N.J.* 325, 335, 495 *A.2d* 406 (1985). Moreover, policies are frequently not read by the insured, "whose understanding is often impeded by the complex terminology used in the standardized forms." *Doto, supra,* 140 *N.J.* at 555, 659 *A.2d* 1371.

Accordingly, ambiguous language in an insurance policy is often construed in favor of the insured. *Id.* at 556, 659 *A.2d* 1371. When an insurance policy's language fairly supports two meanings, one that favors the insurer, and the other that favors the insured, the policy should be construed to sustain coverage. *495 Corp. v. New Jersey Ins. Underwriting Ass'n,* 86 *N.J.* 159, 164, 430 *A.2d* 203 (1981). In other words, when an ambiguity exists within an insurance contract, courts should "interpret the contract to comport with the reasonable expectations of the insured." *Zacarias, supra,* 168 *N.J.* at 595, 775 *A.2d* 1262.

> Justice Jacobs explained the reasonable expectations doctrine:
>
> When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded "to the full extent that any fair interpretation will allow."
>
> [*Kievit v. Loyal Protective Life Ins. Co.,* 34 *N.J.* 475, 482, 170 *A.2d* 22 (1961) (citation omitted).]

The doctrine has been applied to all forms of insurance contracts. *See, e.g., Zacarias, supra,* 168 *N.J.* at 601–03, 775 *A.2d* 1262 (discussing reasonable expectations under boat owner's insurance policy); *Doto, supra,* 140 *N.J.* at 556–59, 659 *A.2d* 1371 (addressing insured's reasonable expectations under commercial-umbrella liability policy related to underinsured motorist coverage); *Sparks, supra,* 100 *N.J.* at 338–39, 495 *A.2d* 406 (applying doctrine in context of professional liability).

## C.

We find *Sparks,* which addressed a similar issue, instructive. There, the defendant, an insurance company, issued an attorney a "claims made" professional malpractice policy that was renewable at successive one-year periods. *Sparks, supra,* 100 *N.J.* at 327–28,

495 A.2d 406. The policy limited coverage to " 'claims arising from the performance of professional services *subsequent to the retroactive date* ' " in the policy. *Id.* at 328, 495 A.2d 406. The policy's retroactive date was the same date as the effective date of coverage. *Ibid.* The policy was prematurely terminated because the attorney failed to pay the premium. *Ibid.*

Following cancellation, the attorney represented the plaintiffs in litigation, but because of his negligence the plaintiffs had judgments entered against them. *Id.* at 327, 495 A.2d 406. The plaintiffs then filed a complaint against the attorney, and sought to have the defendant cover their claim. *Id.* at 328, 495 A.2d 406. The defendant denied coverage, asserting it received notice of the claim after cancellation of the policy. *Ibid.* The plaintiffs filed a declaratory judgment action against the defendant for coverage of their claim. *Id.* at 329, 495 A.2d 406. The trial court granted judgment in favor of the plaintiffs and the Appellate Division affirmed. *Ibid.*

The Court affirmed and explained that the difference between a "claims made" policy and an "occurrence" policy is that a "claims made" policy " 'provid[es] unlimited retroactive coverage and no prospective coverage at all,' " while an "occurrence" policy " 'provide[s] unlimited prospective coverage and no retroactive coverage at all.' " *Id.* at 329–30, 495 A.2d 406. The Court noted that it previously had approved "claims made" policies, as had the substantial majority of courts throughout the country. *Id.* at 331–32, 495 A.2d 406. The Court found that the policy's lack of retroactive coverage in the first policy year "materially diverge[d] from customary 'claims made' coverage." *Ibid.* The Court concluded that if the policy at issue "comported with the generally accepted expectations of 'claims made' insurance," then it "would not hesitate to enforce [it]." *Id.* at 332, 495 A.2d 406. However, the Court found that the policy's limitation on retroactive coverage did "not conform to the objectively reasonable expectations of the insured," and therefore, violated New Jersey's public policy. *Id.* at 339, 495 A.2d 406.

Nevertheless, the Court acknowledged that under certain circumstances, limited retroactive coverage might be both reasonable and expected, *e.g.* if offered at a reduced premium to professionals in their first year of practice, or if the insured changed from an "occurrence" policy to a "claims made" policy. *Id.* at 340 n. 4, 495 A.2d 406. The Court also noted that the provision of "claims made" policies could be enforced if there was evidence that the insured fully understood the terms of the policy. *Id.* at 342 n. 6, 495 A.2d 406. The Court remanded to the trial court to consider whether there was such evidence in the case. *Ibid.*

### D.

Here, it is undisputed that as early as August 1997, Dr. Jenkins represented to C & R and Zurich that he wanted coverage to coincide with the expiration of his then "occurrence" policy with Princeton. Dr. Jenkins received from C & R significant paperwork regarding this policy. Specifically, the binder identified (1) Dr. Jenkins as the insured, (2) February 1, 1998 to April 1, 1998, as the binder period, (3) February 1, 1998, as the retroactive date, and (4) the policy period as January 1, 1998 to January 1, 1999, and the date of insurance as January 1, 1998. Without more, the binder was ambiguous because the retroactive date was set after the policy's effective date; thus it provided no retroactive coverage at all.

Beyond that, although the "Coverage Provided" section of the policy explained that only those claims arising out of a medical incident that occurred on or after the retroactive date would be covered, the declarations page that accompanied both the 1998–1999 and 1999–2000 policies declared that the retroactive date was January 1, 1997. That is significant because our courts place particular emphasis on the declarations page when determining the reasonable expectations of the insured. *See Zacarias, supra,* 168 *N.J.* at 602–03, 775 A.2d 1262; *Lehrhoff v. Aetna Cas. & Sur. Co.,* 271 *N.J.Super.* 340, 346–347, 638 A.2d 889 (App.Div.1994).

Although Zurich explains that the January 1, 1997, retroactive date was intended to apply only to GSPA, and that the declarations page clearly indicated that the retroactive date applicable to Dr. Jenkins was contained in the endorsement, that explanation does not eliminate the ambiguity caused by different retroactive dates. The declarations page directs the insured to cross-reference the endorsement three times, under the headings, "Additional Insured Physicians," "Limits of Liability: Coverage B," and "Endorsements Effective at Inception." However, it does not cross-reference to the endorsement under the "Retroactive Date" heading. That heading simply contains the date January 1, 1997, without further explanation.

Moreover, the term "retroactive date," is not defined or explained in any of the documents. Because the documents provided no definition of the term "retroactive date," we look to its ordinary meaning. *Zacarias, supra,* 168 *N.J.* at 595, 775 *A.*2d 1262. *Webster's II New College Dictionary* 948 (rev. updated 2001), defines retroactive as "[i]nfluencing or applying to a period prior to enactment." For purposes of these documents, we apply that common definition.

■ Under Zurich's interpretation of its policy, whether the policy period began January 1, 1998, or February 1, 1998, the policy provided no retroactive coverage at all if the retroactive date was February 1, 1998. On the other hand, a retroactive date of January 1, 1997, as contained in the declarations page, would comport with the ordinary meaning of the term. In short, the presence of different retroactive dates, the failure to provide a clear definition of the term "retroactive date" and the different policy periods and effective dates, combined to render the policy ambiguous.

E.

■ Because we have concluded that the policy is ambiguous, we now consider the reasonable expectations of the insured to determine the extent of coverage. *Zacarias, supra,* 168 *N.J.* at

595, 775 *A*.2d 1262. In his certification opposing summary judgment, Dr. Jenkins declared that after receiving the binder, he "learned that the policy became effective January 1, 1998." There was a reference to a binder period of February 1, 1998, to April 4, 1998. However, he focused on the policy period of January 1, 1998, to January 1, 1999, because he thought that represented the scope of his coverage. Further, he certified that when he met with O'Brien in January 1998, he did not know what a "retroactive date" was or when his Princeton coverage terminated.

To be sure, there is substantial evidence contradicting Dr. Jenkins assertions. After all, Dr. Jenkins represented to C & R and Zurich that he would require coverage following the expiration of his "occurrence" policy with Princeton on February 1, 1998. Therefore, we conclude material issues of fact exist concerning Dr. Jenkins's reasonable expectations of when the Zurich "claims made" policy would begin to provide coverage. Hence, the fact finder must determine Dr. Jenkins's reasonable expectations. If the fact finder determines that Dr. Jenkins's reasonable expectations were that his "claims made" coverage would begin on or before January 1, 1998, the Zurich policy must provide coverage for plaintiffs' claim that arose on January 3 and 4, 1998. However, if the fact finder concludes that Dr. Jenkins's reasonable expectations were to have "claims made" coverage effective February 1, 1998, for claims arising after that date, then plaintiffs' claim is not covered under the policy.

## III.

Dr. Jenkins contends there was sufficient evidence that C & R breached a legal duty to provide adequate insurance to withstand summary judgment. He argues that expert testimony should not be required because C & R's breach of duty to him is clear as a matter of law. Further, he contends that when an agent induces a prospective customer to abandon his current insurer and to purchase a policy from the agent's principal, the agent should learn the status of the customer's existing coverage

to ensure that the transfer to the new policy will not leave gaps in coverage.

C & R argues that no jury could reasonably conclude that it failed to exercise the requisite skill or diligence in providing "claims made" insurance coverage. C & R asserts that Dr. Jenkins never indicated that his Princeton policy had lapsed or would lapse at any time prior to February 1, 1998. C & R also maintains that even if O'Brien had a duty to advise Dr. Jenkins of the retroactive date's significance, his failure to do so did not affect the outcome because the earliest retroactive date that could have been provided was January 9, 1998, which was after plaintiffs' claim arose. Finally, C & R argues that the imposition of a duty to question the veracity of a client's statements requires expert testimony to establish the duty of care and to explain how C & R breached that duty.

Agents, as amicus, concurs with C & R's arguments and adds that this Court should not expand agents' and brokers' duty to go beyond the requests of an insured unless there is a special relationship between the insured and the agent or broker.

Brokers and agents generally owe the same duties to an insured. George J. Kenny & Frank A. Lattal, *New Jersey Insurance Law* § 6–10, at 157 (2d ed. 2000) ("The distinction between broker and agent is irrelevant when analyzing their obligations to an insured."); *but see Weinisch v. Sawyer*, 123 *N.J.* 333, 340–41, 587 *A.*2d 615 (1991) (noting different remedies available to an insured depend on whether insured dealt with a broker or agent). "Agents, like brokers, are obligated to exercise good faith and reasonable skill in advising insureds" and in informing them of available coverage. *Weinisch, supra,* 123 *N.J.* at 340, 587 *A.*2d 615 (citing *Sobotor v. Prudential Prop. & Cas. Ins. Co.,* 200 *N.J.Super.* 333, 337–41, 491 *A.*2d 737 (App.Div.1984)); *see also Carter Lincoln–Mercury, Inc. v. Emar Group, Inc.,* 261 *N.J.Super.* 245, 250, 618 *A.*2d 870 (App.Div.1993) (noting both agents and brokers owe insured same duty of due care), *aff'd,* 135 *N.J.* 182, 638 *A.*2d 1288 (1994).

In *Rider v. Lynch*, 42 *N.J.* 465, 476, 201 *A*.2d 561 (1964), the Court defined the obligations of a broker as (1) to procure the insurance; (2) to secure a policy that is neither void nor materially deficient; and (3) to provide the coverage he or she undertook to supply. If an agent or broker fails to exercise the requisite skill and diligence when fulfilling those obligations, then there is a breach in the duty of care, and liability arises. *See ibid.*

Here, Dr. Jenkins consistently conveyed to O'Brien that his "occurrence" policy with Princeton expired on February 1, 1998. He provided O'Brien with a policy history from Princeton that confirmed this information. Moreover, when Dr. Jenkins informed O'Brien that his policy premium was past due, O'Brien advised him to make that payment. Most importantly, Dr. Jenkins never informed O'Brien that the Princeton policy was retroactively cancelled to October 17, 1997, and he indicated on his January 9, 1998, application that his previous insurance policies had never been cancelled. Based on Dr. Jenkins's assertions, O'Brien justifiably believed that any additional retroactive coverage (any coverage prior to February 1, 1998) would have been superfluous. Although Dr. Jenkins may have benefited from a more thorough explanation of the Zurich policy, he submitted no proofs to counter C & R's expert's opinion that C & R's actions were consistent with customary industry practice. In the absence of such proofs, the evidence was so one-sided that the trial court properly granted summary judgment in favor of C & R. *See Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A*.2d 146 (1995).

### IV.

In summary, we conclude the insurance documents were ambiguous with respect to the date the policy would begin to provide "claims made" coverage and there are material issues of fact as to whether the Zurich policy comports with Dr. Jenkins's reasonable expectations. We also conclude that Dr. Jenkins failed to present evidence that C & R breached any duty owed to him.

We affirm the Appellate Division judgment in favor of C & R, reverse the judgment in favor of Zurich, and remand to the trial court for further proceedings consistent with this opinion.

Justice VERNIERO, concurring in part and dissenting in part.

I concur in all but one critical aspect of the Court's thoughtful and comprehensive opinion. I agree that the insurance agent in this case breached no duty of care to the insured. I endorse the Court's meticulous analysis in that respect, especially its conclusion that "the evidence was so one-sided [in support of the agent] that the trial court properly granted summary judgment in favor of [that party]." *Ante* at 569, 853 *A.*2d at 258 (citing *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995)).

Unlike my colleagues, I would apply a similar rationale and hold that no reasonable jury could conclude that Dr. Jenkins's expectations were anything but as argued by the insurer. Thus, even assuming that the policy here is ambiguous (a close question but one that I answer in favor of the insured for the reasons expressed by my colleagues), I nonetheless would find that the evidence clearly indicates that Dr. Jenkins reasonably expected no coverage in these circumstances. In that regard, I essentially share the observation of Judge Parrillo who, writing for the Appellate Division's majority, stated:

In this case, the insured specifically understood the terms of the policy and got exactly what he bargained for. In fact, the "retroactive date" of February 1, 1998 was set because of representations made by Jenkins both orally and in writing.

In August 1997, Jenkins told the C & R representative that he was presently insured with Princeton [Insurance Company] and that his coverage with Princeton would expire on February 1, 1998. Shortly after their conversation, on August 18, 1997, Jenkins faxed a completed "Non–Binding Information Quote Form," which represented that his present insurer was Princeton under an "occurrence plus" policy. On this form Jenkins also requested an effective date of "*2/98*". Along with this form, Jenkins forwarded, among other things, a claims and coverage history form from Princeton dated April 19, 1996, documenting policy periods beginning and ending February 1st of every year from 1987 through 1997. After meeting next with the C & R agent on January 8, 1998, the following day Jenkins prepared, signed and dated an "Individual Physicians Application" for insurance,

which represented that his current policy would expire on February 1, 1998. In response to a specific inquiry on the application, Jenkins represented that his professional liability insurance had never been denied, canceled or non-renewed. The application also contained the following language above Jenkins' signature:

> I understand that the coverage offered is provided by a claims made policy *and that incidents that occurred prior to the prior acts or retroactive date are not covered* and claims reported after the expiration date are not covered unless I purchase or otherwise obtain an extended reporting endorsement provided by Zurich [Insurance Company]. (emphasis added.)

And on January 12, 1998, in his application for financing of the premium, Jenkins again represented a policy effective date of February 1, 1998.

> In sum, we think it plain that ... February 1, 1998 ... was specifically understood, indeed requested, by the insured as the date on or after which his acts of negligence would be covered if reported during the policy period. The record is devoid of any evidence that the insured expected, bargained, or for that matter, paid for anything more in the way of coverage.

[*President v. Jenkins,* 357 *N.J.Super.* 288, 306–07, 814 *A.*2d 1173 (2003) (footnote omitted).]

When construing ambiguity in this setting, we defer not to any or all expectations articulated by an insured during the course of litigation, but rather to the *objectively reasonable* expectations at the time the policy was issued. *See DiOrio v. New Jersey Mfrs. Ins. Co.,* 79 *N.J.* 257, 269, 398 *A.*2d 1274 (1979). From that perspective, whether an insured's expectation is objectively reasonable should depend on the totality of the circumstances in a given case. I am persuaded that Dr. Jenkins's own words and deeds surrounding the issuance of the policy lead to only one conclusion as a matter of law, namely, that the insured did not expect what he now seeks as coverage from his insurer. As indulgent as we might like to be in insurance-coverage cases, this case will not be helped by requiring a jury to resolve a question that, in my view, lends itself to only one reasonable answer.

In sum, in respect of the agent, I join in the Court's disposition. Regarding the insurer, I accept that the policy is ambiguous, a finding that requires us to modify the Appellate Division's judgment. I agree, however, with the Appellate Division's ultimate holding in favor of the insurer because I believe that Dr. Jenkins received precisely the coverage that he reasonably expected as evidenced by the totality of the circumstances. Hence, I would

modify and affirm the judgment below. To the extent that my colleagues reach a contrary conclusion, I respectfully dissent.

*For Affirmance in Part/Reversal in Part/Remandment*—Chief Justice PORITZ and Justices ZAZZALI, ALBIN, and WALLACE—4.

*Concurrence in Part/Dissent in Part*—Justices VERNIERO and LaVECCHIA—2.

Not Participating—Justice LONG.