875 A.2d 859

SHEDRACK SKEETE, PLAINTIFF–RESPONDENT, v. CHAISNER DORVIUS, LOUISE TAYLOR, QUEENIE W. THOMAS, JOHN DOES, 1–3 (FICTITIOUS PERSON/ENTITY), RICHARD ROES, 1–3 (FICTITIOUS PERSON/ENTITY) AND ABC INSURANCE COMPANY (FICTITIOUS PERSON/ENTITY), DEFENDANTS, AND PRUDENTIAL INSURANCE COMPANY, DEFENDANT– APPELLANT.

Argued January 4, 2005—Decided June 10, 2005.

*Daniel J. Pomeroy,* argued the cause for appellant (*Mortenson and Pomeroy,* attorneys; *Mr. Pomeroy* and *Karen E. Heller,* on the briefs).

*Martin H. Cowen,* argued the cause for respondent (*Slavitt & Cowen,* attorneys).

Justice LONG delivered the opinion of the Court.

The facts in this case are detailed in the decision of the Appellate Division, *Skeete v. Dorvius,* 368 *N.J.Super.* 311, 845 *A.*2d 1265 (App.Div.2004). We repeat only those that are necessary to our disposition. On June 5, 2000, Shedrack Skeete was injured when a car, owned and driven by Queenie Thomas, in which he was a passenger, was struck by a vehicle owned and operated by Chaisner Dorvius. Skeete, who had no automobile or auto policy of his own, and was not a member of a household with insurance coverage, sued Dorvius whose policy was insufficient to cover his injuries. He also sought Underinsured Motorist (UIM)coverage under Thomas's Prudential policy on which he was an "insured" by virtue of occupying Thomas's covered vehicle.

Thomas had purchased that policy in 1997, electing UM/UIM coverage of $100,000/$300,000. She was the "named insured" on the policy, the UM/UIM provision of which identified her, any relative living in her household and "anyone occupying a car covered under this part" as an "insured." That policy did not contain a step-down clause. Thus any "insured" presumably would have been entitled to the stated UM/UIM limits of $100,-000/300,000.

In 1999, Prudential changed the policy, in part, as a result of the Auto Insurance Cost Reduction Act of 1998 (AICRA) *N.J.S.A.*

39:6A–1.1. Among the changes was the characterization of parties in Skeete's position as "Additional Insureds." Under the new provision, the named insured [1] was entitled to the $100/300,000 limit but Additional Insureds were entitled to only a $15,000/30,000 limit. The new policy stated:

> Additional Insureds as described in this part are also covered, but only up to a limit of $15,000 per person/$30,000 per occurrence. Coverage is subject to the Uninsured and Underinsured Motor Vehicle definitions.
>
> * * *
>
> Limit of Coverage–Bodily Injury: Each Person
>
> The amount shown on the declarations page under Uninsured Motorists Bodily Injury—Each Person is the maximum limit of liability for all damages, including damages for care or loss of services, arising out of Bodily Injury to one Insured injured as a result of any one accident. However, if you are an Additional Insured as defined under this part, the maximum liability for Each Person is $15,000.

The Appellate Division described in detail how Thomas was notified of the changes in the policy. *Skeete, supra,* 368 *N.J.Super.* at 314–17, 845 *A.2d* 1265. In brief, on May 25, 1999, Thomas received two packages of material from Prudential. The first was an 83 page document reflecting the AICRA changes. The second contained another thirty pages. Together the 113 pages in the two May 25 packages included a cover letter advising the insured to read the notices of change and a three page notice outlining the changes. Also included were a New Standard Auto Policy Booklet Parts 1, 2, 3, 4, a separate Part 5, a renewal declarations page, a bill, insurance identification cards, Notice of Policy Changes, PIP Pre–Certification Requirements, Endorsements PAC 4220 and PAC 236 and PCD 3523 standard coverage selection forms, a Buyer's Guide, and a Rating Information Form.

The declarations page of the new policy, included in the 83 page package, stated coverage, limits and premiums that did not reflect the step down:

Uninsured Motorists-Bodily Injury
Each Person      $100,000
Each Accident     $300,000

---

[1] Separate provisions governing resident relatives were also included.

The UM/UIM premium was $21, a $2 reduction consistent with the notice that the policy was being re-rated as required by AICRA.

Endorsement PCD 3523 stated in relevant part:

> [To the] Uninsured/Underinsured Motorists Coverage section of your policy we have added a clause which serves to limit the amount recoverable under these coverages to $15,000 per person, $30,000 per occurrence for persons who are not named insureds or resident relatives, but who are injured while passengers in your car.

In addition to the 113 pages Thomas received on May 25, on June 9, 1999, Prudential sent her another package of 78 pages re-rating her policy in accordance with AICRA. The June 9 package included the New Standard Automobile Policy booklets, an amended declarations page and Important Notice to New Jersey Policy-holders, highlighting policy changes. The amended declaration page again listed the coverage for Uninsured Motorists as $100,000 for each person and $300,000 for each accident with no notation about the step-down in coverage.

When faced with the question of the sufficiency of Prudentials notice of the step-down, the Appellate Division concluded:

> We have considered the extensive record before us in light of the applicable law, and we are satisfied that the manner in which Prudential notified Thomas of the change in UM/UIM coverage—inundating her with almost 200 pages of documents in a two-week period, burying the change in a few unremarkable paragraphs, and failing to note the change on the declaration page—was inadequate for the average policyholder to determine that the UM/UIM coverage was amended and how the amendment would affect the policyholder.

> \* \* \*

> In reviewing the documents provided to Thomas, we are persuaded that the policyholder would reasonably expect that the coverage shown on the declaration page remained the same as the previous year. It is unlikely that the average policyholder would have identified the step-down in UM/UIM coverage without extensive detective work, an unreasonable encumbrance on a policyholder that can only result in hidden pitfalls such as are presented here.

> \* \* \*

> We hold that unless specific changes in the limits of coverage are noted on the declaration page, the carrier's notice of changes in coverage is inadequate.

The Court went on to reverse the summary judgment entered in Prudential's favor.

■ We granted Prudential's petition for certification *Skeete v. Dorvius*, 180 *N.J.* 456, 852 *A.*2d 192 (2004), and now affirm. Prudential reiterates the essential argument that it advanced before the Appellate Division—that its efforts to notify Queenie Thomas of the changes in her policy were adequate. We disagree. Substantially for the reasons expressed by the Appellate Division, we have concluded that the notice of the addition of the step-down was insufficient because of its presentation as part of an essentially undifferentiated passel of two hundred documents. It is the placement of the notice and not its specificity that is the issue.

■ We add this caveat. We are not prepared to say that every single policy change must be reflected on the declarations sheet. That simply may not be practical in every situation as this case, which involves a large scale statutory overhaul, demonstrates. Thus, for example, had the insurer sent the cover letter with the three page notice outlining the changes separately, thus giving the insured a chance to digest the changes before drowning her in a sea of paper, the outcome might well have been different. In sum, we hold that policy changes must be conveyed fairly to the policyholder, although in no particular form, and that in this case the insurer fell short.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, concurring.

I concur in Justice Long's opinion that Prudential did not adequately convey to Queenie Thomas, its insured, the policy changes to her UM/UIM coverage. I write separately to give additional reasons for affirming the judgment of the Appellate Division. The UM/UIM coverage suggested in the insurance policy's declaration page was at odds with the detailed information Thomas received in the blizzard of documents provided by Prudential. I have no doubt that a reasonably intelligent insured reading the declaration page in this case would have been misled

as to the UM/UIM coverage policy limits. I am, therefore, in full accord with the Appellate Division's determination that Thomas was entitled to the coverage that she reasonably expected under the policy, particularly because Prudential failed to provide her with succinct and accurate information on the declaration page.

Our case law recognizes that "[a] personal automobile insurance policy is a bulky document, arcane and abstruse in the extreme to the uninitiated, unversed and, therefore, typical policyholder." *Lehrhoff v. Aetna Cas. & Sur. Co.*, 271 *N.J.Super.* 340, 346, 638 *A.*2d 889 (App.Div.1994); *see also Doto v. Russo*, 140 *N.J.* 544, 555, 659 *A.*2d 1371 (1995). In *Lehrhoff, supra*, Judge Pressler, writing for the appellate panel, stressed the "signal importance" of the declaration page in "defin[ing] the insured's reasonable expectations of coverage." 271 *N.J.Super.* at 346–47, 638 *A.*2d 889. The *Lehrhoff* panel concluded that

it is the declaration page, the one page of the policy tailored to the particular insured and not merely boilerplate, which must be deemed to define coverage and the insured's expectation of coverage. And ... [the] reasonable expectations of coverage raised by the declaration page cannot be contradicted by the policy's boilerplate unless the declaration page itself clearly so warns the insured.
[*Id.* at 347, 638 *A.*2d 889.]

We quoted the language above with approval in *Zacarias v. Allstate Ins. Co.*, 168 *N.J.* 590, 602, 775 *A.*2d 1262 (2001). We noted that we "share[d] the sentiments expressed by the Appellate Division in *Lehrhoff* in respect of the importance of the declarations sheet." *Ibid.* We also "emphasize[d] ... that the one page most likely to be read and understood by the insured is the declarations sheet." *Id.* at 603, 775 *A.*2d 1262. In that regard, we "advised [insurers] to explore ways to incorporate as much information as may be reasonably included in the declarations sheet." *Id.* at 603–04, 775 *A.*2d 1262. Last year, in *President v. Jenkins*, we asserted again that we "place particular emphasis on the declarations page when determining the reasonable expectations of the insured." 180 *N.J.* 550, 565, 853 *A.*2d 247 (2004) (citing *Zacarias, supra*, 168 *N.J.* at 602–03, 775 *A.*2d 1262; *Lehrhoff, supra*, 271 *N.J.Super.* at 346–47, 638 *A.*2d 889).

In applying those principles to this case, I believe that the average insured would reach completely different conclusions regarding the UM/UIM coverage limits in Thomas's policy depend-

ing upon whether she read the declaration page or the fine print on the policy amendment that came enclosed with a volume of other material. Under the terms of her original insurance policy, Thomas and each occupant of her insured vehicle had up to $100,000 of uninsured motorist coverage, with a total coverage cap of $300,000 for each accident. The declaration page provided Thomas with her "policy limits, coverages, and premiums" regarding uninsured motorists:

| COVERAGES | LIMITS | PREMIUMS |
|---|---|---|
| . . . . | | |
| Uninsured Motorists | | |
| Bodily Injury | | |
| Each Person | $100,000 | $23[2] |
| Each Accident | $300,000 | |

After Prudential amended the UM/UIM policy limits, Thomas's coverage for non-relative occupants injured in her car was reduced to no more than $15,000 per person, with a total of $30,000 in coverage per accident. On three separate occasions after that policy amendment, Prudential issued to Thomas new declaration pages that did not reflect the significant restriction in her UM/UIM coverage, leading Thomas to believe that the original coverage limits still applied.

Nothing in the language on Thomas's declaration page would have suggested to the average insured that a passenger in her car would be subject to a coverage limit of $15,000. The continued use of the old and unmodified declaration page was misleading because it created expectations out of line with the coverage limits detailed in the fine print of the policy.

In this case, Prudential easily could have incorporated additional information into the declaration page to ensure that Thomas had a full understanding of her coverage limits. For example, the declaration page could have read:

---

[2] Thomas's premium was later reduced to $21.00.

| COVERAGE | LIMITS | PREMIUMS |
|---|---|---|

. . . .

| | | |
|---|---|---|
| Uninsured Motorists | | |
| Bodily Injury | | |
| Insured | $100,000 | |
| $21 | | |
| Each Accident | $300,000 | |
| Resident Relative | | |
| w/o auto policy | $100,000 | |
| Other persons | $ 15,000 | |

The additional steps necessary to conform the declaration page to the policy were not cumbersome. At least since *Lehrhoff supra,* Prudential was on notice about the particular need for accuracy on the declaration page—the one page that an insured would most likely read and comprehend. 271 *N.J.Super.* at 346–47, 638 *A.*2d 889; *see also Zacarias, supra,* 168 *N.J.* at 602, 775 *A.*2d 1262.

This Court has long held that "[w]hen members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations." *Kievit v. Loyal Protective Life Ins. Co.,* 34 *N.J.* 475, 482, 170 *A.*2d 22 (1961). "They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded to the full extent that any fair interpretation will allow." *Ibid.* (internal quotations omitted).

Thomas was entitled to benefit from the reasonable expectations of coverage raised by the declaration page, notwithstanding the contradictory language in the policy, lost among reams of paper. Prudential is capable of drafting a clear, simple, and understandable declaration page. For those reasons, I would affirm the judgment of the Appellate Division.

Justice ZAZZALI joins in this opinion.

Justice LaVECCHIA, dissenting.

I would reverse the Appellate Division judgment. The policyholder in this matter purchased a policy of insurance that con-

tained uninsured and underinsured motorist (UM/UIM) coverage. The policy provisions setting forth that coverage are not the focal point of this dispute. There is no policy ambiguity that must be interpreted in favor of an insured's reasonable expectations. Rather, a majority of the Court holds that the unambiguous policy language is not enforceable because the insurer, here Prudential Insurance Company, did not inform the policyholder about changes in the details of UM/UIM coverage by means of a communication that was distinct enough to be acceptable to the Court. *Ante* at 8–9, 875 *A.*2d at 861.

Although I am unable to join in the holding of the majority, in my judgment the majority is wise not to base any part of its reasoning in favor of coverage for plaintiff on the declarations pages of Thomas's insurance policy. The Appellate Division decision below, had its reasoning stood, would have inappropriately extended the holding of *Lehrhoff v. Aetna Cas. & Sur. Co.*, 271 *N.J.Super.* 340, 638 *A.*2d 889 (App.Div.1994). The facts here are markedly different from that matter.

This is not a case in which the declarations pages of a personal automobile insurance policy contained information that was rendered false by application of the policy's provisions. Such were the facts in *Lehrhoff* where the personal automobile policy named a couple's son as a covered person for the family's insured vehicles, but contradictory terms of the policy operated to exclude him from coverage. *Id.* at 349, 638 *A.*2d 889. The Appellate Division below read *Lehrhoff* as requiring a declarations page to inform a policyholder about all nuances of coverage. However, the facts in *Lehrhoff* do not support such a sweeping conclusion. To the extent the *Lehrhoff* decision contains language that broadly describes the declarations page as "defin[ing]" a policyholder's coverage, *id.* at 347, 638 *A.*2d 889, that language must be understood as an inapt descriptor of the purpose of the "declarations" sheet or pages of a policy.

A "declarations" sheet does not—and does not purport to—summarize an entire policy. Nor do insurance regulatory requirements require it to do so. One can search the regulations of the

Department of Banking and Insurance in vain for an overall standard for declarations sheets. The few regulatory references to the declarations sheet disclose finely focused requirements not pertinent here.[3]

Declarations sheets may vary from insurer to insurer. Their common features, however, illuminate the purpose of the document. As was the case here, the declarations sheet identifies the attributes that differentiate one policyholder of the insurer from another, *i.e.* number of cars, age, use, coverages selected and their upper limits, from the viewpoint of the insurer and, from that vantage point, enables the policyholder to examine the premium set for the policy based on rates charged for the selections made. One need only compare a declarations sheet to the prescribed format and text requirements for the detailed Coverage Selection Form that must be mailed to an insured, with a Buyer's Guide, in connection with both securing coverage and upon each successive renewal, to recognize the modest, yet practical expectations placed on the minimal information captured in the declarations sheet. *See N.J.A.C.* 11:3–15.1 to –15 App. (establishing requirements for Buyer's Guide, Coverage Selection Form, and Automobile Insurance Consumer Bill of Rights). In respect of coverages selected, the declarations sheet is fundamentally unlike the Coverage Selection Form in informative detail. It is not an explanation of the coverage selections; it merely lists the selections and identifies their upper parameters. The policy provisions remain operative and controlling on the specifics of coverage.

It is not disputed in this record that the declarations pages referred the insured to the policy's terms in respect of coverage limits. The declarations pages indicated that the coverages and

---

[3] *See N.J.A.C.* 11:3–19A.6(b) (requiring pertinent tier rating level used for premium calculation, when applicable, to be disclosed on declarations sheet, or in another document accompanying policy); *N.J.A.C.* 11:3–9.1(b) (mandating that when declarations sheet contains code numbers and abbreviations identifying rating information for vehicles, rating information may be supplied separately through interpretive form); *N.J.A.C.* 11:3–13.5(e) (requiring declarations sheet to disclose by vehicle any applicable named driver exclusion elected by insured).

limits listed were subject to the terms of the policy. This declarations sheet thus performed its task. The insured was informed accurately of the coverages she selected for her personal automobile, and their upper limits. Because the policy provisions flesh out the terms of the coverages, the insurer's so-called "failure" to provide detailed explanations about the policy's terms on the declarations sheet does not make the declarations misleading. To suggest that the declarations sheet can, and must, summarize detailed, operative policy terms, is unrealistic and unreasonable.

That said, I turn to my disagreement with the majority of the Court in this matter. The insured received, with her policy and in addition to the declarations pages attached to that policy, a cover letter that specifically drew her attention to a concise, understandable three-page notice in which the UM/UIM limitation was explained. That criticized communication is not faulted for containing false, deceptive, or misleading information. Indeed, there is no suggestion in this record that the notice description of the change in the UM/UIM coverage, which Prudential provided in its supplemental material, was inadequate in any way. Ironically, Prudential is faulted for including too much information in what it communicated to its insured. According to the majority, Prudential's blame lies in telling its insured an undefined, and indefinable, "too much" at one time.

Without more—such as a claim that Prudential intentionally "buried" this information in an avalanche of unnecessary data— the adequacy of Prudential's notice is not lessened simply because of the quantity of materials included in the mailing. That is particularly so when as here, the information imparted by the insurance carrier, both in its substance and in its quantity, was due to statutory changes being effectuated at that time. At bottom, the Court bases its holding on personal predilections—it imposes as the standard of measure its own favored means for highlighting the terms of the insured's UM/UIM coverage to the insured. According to the majority, the information here was prominent, but just was not prominent enough. In the majority's view, it was not enough that the UM/UIM information was placed in an explanatory letter accompanying the policy. The explanato-

ry notice of the change in UM/UIM coverage simply did not stand out in the large package of information mailed at one time to the insured with the policy.

That criticism is, to me, too fickle to apply reasonably. I cannot join in a holding that provides an entire industry with so little guidance as to how it must conduct its business particularly when, as here, it is required to address wholesale statutory changes affecting the policies of insureds. The community of regulated insurers—indeed, every citizen of this State—rightfully is entitled to more certainty than that.

Insurers must be able to communicate with their insureds about policy information without being subjected to the capricious preferences of a reviewing court about how a communication could have been improved. A court's preferred approach to that communication (what words must be used to broadcast its prominence above other information that must be disclosed, or where it is located within a document or series of documents containing other information about the policy, and whether it should be separately stapled, or mailed by separate envelope) simply makes for a changeable standard not conducive as a rule of law that governs whether policy language will be enforced.

One wonders now how many materials can be mailed to an insured in one mailing before running afoul of the Court's holding today. Are three, ten, or twenty pages permissible? Are fifty too many to include in one mailing? Does the order of placement of the documents within the envelope matter? Must individual envelopes be the only safe means of communicating information to an insured henceforth? In today's electronic age, we should not hamstring insurers in their modes of communication with insureds by deciding this matter on arcane, and ultimately personally idiosyncratic, notions of how information is to be shared.

I must respectfully dissent. I would reverse the Appellate Division and reinstate the judgment of the trial court that awarded summary judgment to Prudential and dismissed this action.

The Chief Justice and Justice RIVERA–SOTO join in this dissent.

*For affirmance*—Justices LONG, ZAZZALI, ALBIN, and WALLACE—4.

*For reversal*—Chief Justice PORITZ, and Justices LaVECCHIA, and RIVERA–SOTO—3.